NOTICE
Decision filed 03/14/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 200164

NO. 5-20-0164

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| GINGER L. VICKERS., | ) | Hamilton County. |
| | ) | |
| Petitioner-Appellee and Cross-Appellant, | ) | |
| | ) | |
| and | ) | No. 13-D-16 |
| | ) | |
| QUENTIN L. VICKERS, | ) | Honorable |
| | ) | Evan L. Owens, |
| Respondent-Appellant and Cross-Appellee. | ) | Judge, presiding. |

_____

JUSTICE MOORE delivered the judgment of the court, with opinion.
Justices Welch and Wharton concurred in the judgment and opinion.

**OPINION**

¶ 1 The respondent-appellant and cross-appellee, Quentin L. Vickers (Quentin), appeals the circuit court of Hamilton County's April 24, 2020, order, which (1) granted a directed verdict on Quentin's second amended petition to modify in favor of petitioner-appellee and cross-appellant, Ginger L. Vickers (Ginger), at the close of Quentin's case-in-chief and (2) imposed sanctions against Quentin pursuant to section 610.5(f) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/610.5(f) (West 2018)). Further, Quentin asserts that the trial court erred in not finding that Ginger was in willful contempt for her failure to abide by the applicable allocation order.

1

¶ 2     Ginger, on cross-appeal, argues that the trial court erred when it *sua sponte* granted Quentin more parenting time following its dismissal of Quentin's second amended petition to modify and further erred when the trial court denied Ginger's request for sanctions pursuant to Illinois Supreme Court Rule 137 (eff. Jan. 1, 2018) against Quentin for filing multiple frivolous petitions to modify. For the following reasons, we affirm in part and vacate in part.

¶ 3                                    I. BACKGROUND

¶ 4     At the outset, we note that this is an expedited appeal, pursuant to Illinois Supreme Court Rule 311(a) (eff. July 1, 2018), because it involves the custody of an unemancipated minor. Our decision was due to be filed on October 13, 2020. However, the decision is being issued beyond this date for good cause, as the matter was held in abeyance at the request of Quentin for approximately five months due to a pending posttrial motion in the circuit court filed by Ginger and numerous motions for extensions of time filed by Quentin resulted in delays of the progression of this case. See Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). Briefing on this matter was finally completed on December 22, 2021, and the case was set for the court's January 11, 2022, setting as a nonoral matter. We now issue our disposition.

¶ 5     Quentin and Ginger were divorced on August 3, 2016, by the entry of a judgment of dissolution of marriage and an allocation of parental responsibilities and parenting plan (allocation order). The judgment of dissolution of marriage and the allocation order resulted from a contested bench trial that occurred over six days. The parties have two minor children together, S.V. and K.V.

¶ 6     Following the trial, the trial court awarded to Ginger the sole discretion in decision-making regarding the education of the minor children, regarding extracurricular and recreational activities for the minor children, and regarding the healthcare and medical treatment provided to the minor

children. The trial court also ordered that "The children shall attend public school(s) for the school district in which [Ginger] resides."

¶ 7    The allocation of parenting time for Quentin consisted of alternating weekends; every Wednesday evening; a detailed holiday schedule, including birthdays; and additional parenting time in the summer. The trial court ruled that "In an effort to minimize the friction between the parents and maximize the comfort of the children, the majority of exchanges will take place at the children's school, effectively eliminating much of the physical interaction between the parties."

¶ 8    Quentin filed *pro se* a petition to modify parenting time between himself and Ginger on May 29, 2018. Quentin subsequently retained an attorney and filed his first amended petition on August 2, 2018. He filed his next petition on August 13, 2019, being his second amended petition to modify, which is the petition before this court.

¶ 9    The second amended petition to modify alleged various changes in circumstances and requested Quentin's parenting time with the minor children be modified so that he received the majority of parenting time. Those allegations are discussed in further detail below and in our analysis section.

¶ 10    In addition to the above-mentioned petition to modify parenting time, Quentin also filed a petition for rule to show cause on August 2, 2018. Quentin's petition for rule to show cause alleged that Ginger violated section E of the parties' allocation order, which provided, in relevant part, that the parties "shall communicate regarding the care and well being of the minor children via text messaging and email," "Father shall be able to communicate with the minor children via phone at reasonable times," and "In the event that a parent attempts to contact the children, the parent with whom the children are with shall make the children aware that the other parent has attempted the contact and shall telephone the other parent back as soon as practicable." The petition alleged that

Ginger violated the above provision by refusing to give Quentin her personal cell phone number, so that he could contact the children and/or communicate with Ginger. Quentin further alleged that Ginger shut off the telephone of their oldest child, S.V., which prohibited him from contacting the children, and that Ginger failed to call him back after his calls to the children went unanswered.

¶ 11    A hearing was conducted on Quentin's second amended petition to modify and his petition for rule to show cause over the course of two days, January 22, 2020, and March 4, 2020. Quentin called two witnesses, Ginger and himself.

¶ 12    Quentin first called Ginger to testify as an adverse witness. Ginger testified that, at the time of her divorce, she lived with her parents in Hamilton County and the children attended school at Hamilton County. She testified that, following her divorce, she moved approximately 10 miles away to Norris City, Saline County, Illinois, and she had been there since approximately January 2018. She testified that even though Norris City is in the Eldorado school district, Hamilton County school allowed the children to continue to attend because they were already registered for the 2017-18 school year. The next school year, Ginger registered the children at Eldorado school district, in accordance with the allocation order. She testified that the distance between the schools was not far, being only a 20- to 25-minute drive from one school to the other. She further testified that one of the reasons for the move was to allow the children more opportunities to participate in various activities not offered at Hamilton County. According to her testimony, Ginger informed Quentin of the move and change in schools.

¶ 13    Ginger testified that, following the divorce, Quentin asked that she give him her cell phone number. She declined to give him her phone number because Quentin had her work phone number and her work and personal e-mail addresses. Further, she found some of Quentin's attempts to communicate were harassing in nature, and therefore, did not feel comfortable giving him that

information. Ginger testified that the parties' oldest child, S.V., had a cell phone that Quentin could call in order to contact their children. Ginger denied ever "turning off" S.V.'s cell phone.

¶ 14    Ginger was then questioned regarding numerous e-mails between herself and Quentin. We discuss those of note below.

¶ 15    In the first e-mail, Quentin asked for a phone number to contact K.V. so he could wish him a happy birthday. There was no response indicated on the e-mail from Ginger. Ginger did not recall receiving the e-mail.

¶ 16    The next e-mail was from Quentin to Ginger. It contained Quentin's new address and stated, "I really need the address where the kids reside, a phone number also for emergency purposes. I can't always email." Ginger did not recall receiving the e-mail.

¶ 17    In the next e-mail, Quentin claimed S.V.'s phone had not worked in over a month and that he believed the phone was shut off while S.V. was with Ginger. Ginger responded that the phone has been working and that Quentin has contacted the kids on it. She then asked Quentin to "Stop with your harassment." Ginger testified that Quentin had her work phone number, but he started calling and harassing her and sending texts to that number. She testified that when Quentin would e-mail her and claim that S.V.'s phone was not working, she would call the phone or check it and confirm it was working. Ginger testified there were occasions when she would ask S.V. to consider calling her father and talking to him, even some occasions when she would dial Quentin's number on the phone and hand it to S.V. S.V. would often end the call and indicate she did not want to speak with him.

¶ 18    Ginger was next shown an e-mail between the parties regarding a school project that K.V. had left at Quentin's home. Ginger testified that Quentin had informed her about the project and that she asked Quentin to send a picture. Quentin responded that "It can't be emailed. It's a poster-

5

type thing. Find the time to come and get it. Don't blow off his project please." Ginger then responded by asking if Quentin was refusing to send a picture. Ginger testified that, during these exchanges, Ginger had messaged K.V.'s teacher and inquired about the project. She was informed that K.V. had a blank piece of cardboard paper with nothing on it and that K.V. would be supplied with another piece of paper at school so he could finish the project.

¶ 19    Ginger was then asked about S.V.'s participation in gymnastics and shown various e-mail exchanges between the parties regarding S.V.'s change of gymnastics location. In one e-mail, Quentin asked Ginger why S.V.'s last name was listed as "Launius" (Ginger's maiden name). Ginger testified that following the divorce she began using her last name. When she signed S.V. up for gymnastics at the new location she put her name down, Ginger Launius, and then wrote down only S.V.'s first name. She testified that the gym must have assumed she and S.V. shared the same last name and listed it that way on S.V.'s paperwork. The next e-mail contained correspondence between the parties discussing, *inter alia*, S.V.'s gymnastics schedule. The e-mail contained an image of a partial schedule of upcoming gymnastics events. Ginger testified that she took the picture and sent it to Quentin to see if he would be able and/or willing to take S.V. to the events that fell on his time. She wanted confirmation because, in the past, Quentin had not taken S.V. to some of her meets when it occurred during his time, and she did not want to sign S.V. up and pay the fees if S.V. was not going to be able to participate fully. Ginger testified that she informed Quentin of S.V.'s gymnastics change prior to it occurring and that she also informed him about a particular "level-up" competition once she learned of it.

¶ 20    Ginger was next shown an e-mail between the parties regarding K.V.'s baseball participation. The e-mail was from Ginger to Quentin stating: "The teams have been posted for baseball. *** She has posted the first practice for this Wednesday at 5:30 p.m." Ginger testified

6

that she sent the information to Quentin shortly after learning of it and only found out the information from another player's mother, who informed her that the baseball program uses an app to relay teams and schedule. In response, Quentin indicated that he wished they would communicate through telephone.

¶ 21    Ginger next testified that sometimes, when responding to Quentin's e-mails, she would send a reply to a message from one of his accounts to a different e-mail account that he had. Ginger testified that she did so because "if he doesn't respond to an email to his other email address, I send it to that one. Sometimes I send them to both together just to make sure he gets it." She also acknowledged that she received an e-mail wherein he requested that she reply to the e-mail account he sent the e-mail from, instead of a different e-mail.

¶ 22    Ginger was next asked about an e-mail regarding the parties' children's social security information. Ginger testified that when Quentin asked for the children's social security cards, she supplied the information by sending pictures of the cards and typing the social security number for each child in an e-mail to him.

¶ 23    Ginger next testified regarding a situation where S.V. was supposed to go to Quentin's home on a Friday afternoon following school, but she did not. Ginger informed Quentin once she was notified by the school and the exchange occurred on Saturday under police supervision. Quentin then e-mailed her requesting additional time on the Monday following, which was Labor Day, and Ginger denied his request.

¶ 24    Ginger testified that both children love attending the Eldorado school and are getting good grades. Ginger also testified that she does not get to talk to the kids much when they are with Quentin.

7

¶ 25    Ginger testified that she never prevented or discouraged the children from participating in extracurricular activities. She testified that she left the choice of whether the children participated in particular extracurricular activities up to them. In the same line of questioning, Ginger was questioned, "As it relates to sporting activities, you assert under the parenting plan that when you have [the children], you can sign them up for whatever you want, and if [Quentin] doesn't want to take them, that's fine, and vice versa?" Ginger responded, "Well, kind of *** I don't sign them up for—look what they are in now. [S.V.] does scholar bowl and she just applied for volleyball, which [Quentin] and I discussed and never got an answer from him even yesterday" and "[K.V.] is not in anything extracurricular, so nothing is interfering with any of [Quentin's] time now." Ginger testified that there were occasions when K.V. did not attend his baseball games when the children were with her and times K.V. did not attend games when he was with Quentin.

¶ 26    Following Ginger's testimony, Quentin was called to testify. Quentin was generally asked about the same e-mails that Ginger was questioned about during her testimony.

¶ 27    Quentin testified that he did not get to speak to his son on his son's birthday because Ginger did not reply to his e-mail requesting to do so. He testified that he sent his new home address to Ginger in an e-mail on June 10, 2018, but that she never informed him of the address she moved to after she left her parents. He testified that she has never given him her personal phone number.

¶ 28    Quentin then testified that on multiple occasions since the allocation order was entered, he did not receive any response to the e-mails he sent Ginger. Additionally, Quentin testified that there were scheduling issues between himself and Ginger regarding the children's activities where he was not given information regarding upcoming events.

8

¶ 29    He testified that he was not informed by Ginger that S.V. planned to change gymnastics locations. Quentin did admit that Ginger sent him a picture of the new gymnastics schedule and told him about the October "level-up" competition.

¶ 30    Quentin testified that he e-mailed Ginger, asking for the children's social security cards, and Ginger did not respond. He then retrieved the social security numbers on his own.

¶ 31    Quentin testified to an e-mail exchange between himself and Ginger where he asked which teachers the children were assigned for the new school year and whether he was listed on their registration. He testified that Ginger did not answer his questions, but simply responded, "Okay." He further testified that similar things happened with the children's sports coaches. He testified that in May 2018, Ginger and he had a recurring issue where Ginger would respond to a different e-mail account than the account from which he sent the initial e-mail. He testified that this created an issue because it would break the e-mail "loop," which made it hard to keep track of information.

¶ 32    Quentin next testified regarding the issues he had contacting the children via phone. He testified that K.V. does not have a phone but acknowledged that S.V. did have a phone that Ginger provided. He went on to testify that he regularly had problems contacting S.V. when she was with Ginger. He testified that while S.V. was at his home, he attempted to call her phone to see if it would work, and it had no service. He further testified that when S.V. was with Ginger, the phone would go straight to voicemail as if it was turned off or did not have service.

¶ 33    Quentin testified that Ginger signed K.V. up for baseball in 2018, but he signed K.V. up in 2019 after talking with Ginger and telling her that K.V. wanted to play. He testified that Ginger never indicated her acceptance of whether it was okay with her that he signed K.V. up for summer baseball. Ginger did take K.V. to his first practice in 2019. Quentin testified that Ginger did not take K.V. to any of his games that fell on her time and that missing those games upset K.V.

9

¶ 34    Quentin testified that S.V. has grown up and changed in the time since the allocation order was entered. He testified that S.V. previously seemed excited about marching band and basketball but ended up not participating. At the time of his testimony, she was trying out for volleyball.

¶ 35    Quentin testified that, in 2017, he remarried and that his wife, Emily, and the children have a good relationship and get along. Quentin testified that he has a good relationship with both children and denied any issues with S.V. ignoring him or refusing to speak to him while he is with her. That is only relayed to him by Ginger when S.V. is with her.

¶ 36    When asked how the change of school location from Hamilton County school to Eldorado school affected his ability to be present for events such as sports and school activities, Quentin responded, "It does make it a little tougher" and "I don't have the rapport with Eldorado schools, it's been tough to find information about what's going on." He testified that Ginger does not advise him of school events and that this has caused him to miss some of the children's events. On occasion, he has shown up to an event, thinking the children would be participating, but they were not.

¶ 37    At the conclusion of Quentin's presentation of evidence, Ginger moved for a directed finding pursuant to section 2-1110 of the Code of Civil Procedure (735 ILCS 5/2-1110 (West 2018)). After hearing arguments from both parties, the trial court entered the following docket entry:

    "Atty Stewart moves for a directed finding at the conclusion of Mr. Vickers' case; Both parties argue; Court finds that there has NOT been presented sufficient evidence of a substantial change in circumstances and the Petition to Modify should be dismissed; court directs counsel to provide arguments on availability of the court to make minor modifications to prior judgment in light of *Burns v. Lifferth*, 2019 Ill. App. 2d 180715; the

10

recommendations of parties concerning any minor modifications; and arguments as to the evidence presented on the rule to show cause; Arguments concerning court's popwer [*sic*] on future filings of Petitions to Modify; Said arguments and recommendations shal [*sic*] be made within 21 days; Clerk please send File to Court on 04/01/2020 for ruling."

¶ 38    On April 24, 2020, the circuit court entered a written order that (1) dismissed Quentin's second amended petition for modification "with prejudice," (2) found that Quentin's petition for modification filings had been "frivolous and repeated" and barred Quentin "from filing future Petitions to Modify the order allocating parental decision making responsibilities, not including parenting time, pursuant to 750 ILCS 5/610.5 for a period of two years from the [*sic*] March 4, 2020[,] unless permitted by the court after the filing of affidavits which display that there is reason to believe the child's present environment may endanger seriously his or her mental, moral, or physical health or significantly impair the child's emotional development," (3) found that Quentin failed to present sufficient evidence that Ginger violated the terms of the court's order concerning communication with the children and dismissed Quentin's rule to show cause, and (4) found that "a minor modification of the parenting time portion of the order is necessary" due to the children's change of school districts and ordered that Quentin's parenting time be extended "until Monday at 8 AM, *every other* alternating weekend of Father's parenting time." (Emphasis in original.)

¶ 39    On May 13, 2020, Quentin filed a timely notice of appeal. On May 22, 2020, Ginger filed a motion requesting the trial court reconsider its *sua sponte* modification of parenting time in its April 24, 2020, order and further moving for sanctions under Illinois Supreme Court Rule 137 (eff. Jan. 1, 2018) for Quentin's "frivolous and repeated" modification filings. As a result of Ginger's motion to reconsider, Quentin's appeal was held in abeyance by this court until the trial court ruled on Ginger's motion.

¶ 40    On December 16, 2020, the trial court made a docket order that denied Ginger's motion for reconsideration in that "The court granted minor modificaitons [*sic*] only as they were in the best interests of the children" and denied Ginger's request for sanctions, finding that "The court did not and does not find *** that the actions were commenced with the intent to harass or were vexatious in any way. The court should only reserve Rule 137 sanction for the most agregious [*sic*] cases."

¶ 41    Ginger filed her notice of cross-appeal with the circuit court on January 5, 2021. On January 21, 2021, this appeal was taken out of abeyance.

¶ 42                                    II. ANALYSIS

¶ 43    The following issues have been raised by the parties: (1) whether the trial court erred in directing a verdict in favor of Ginger on the second amended petition to modify, (2) whether the trial court erred in its sanctioning of Quentin under section 610.5 of the  Act (750 ILCS 5/610.5 (West 2018)) for filing "frivolous and repeated" petitions to modify, (3) whether the trial court erred in finding that Quentin failed to present sufficient evidence that Ginger violated the terms of the court's allocation order concerning communication with the children, (4) whether the trial court erred in *sua sponte* granting additional parenting time to Quentin following its dismissal of his second amended petition to modify, and (5) whether the trial court erred in denying Ginger's request for sanctions pursuant to Illinois Supreme Court Rule 137 (eff. Jan. 1, 2018) for Quentin's filing of multiple frivolous petitions to modify. We find that as to issues 1, 3, and 5, the circuit court did not err. However, we find the court did err regarding issues 2 and 4. We address each issue in turn below.

¶ 44    A. Whether the Trial Court Erred in Directing a Verdict in Favor of Ginger on the

Second Amended Petition to Modify

¶ 45    Our first issue is whether the trial court erred in directing a verdict in favor of Ginger on the second amended petition to modify at the close of Quentin's case-in-chief. "We note first that, in general, in a nonjury case when a court grants a directed finding based upon the failure to establish a *prima facie* case, we review the court's decision *de novo*." *In re Marriage of Burns*, 2019 IL App (2d) 180715, ¶ 24. However, the "standard of review of custody modification judgments is the manifest weight of the evidence." *In re Marriage of Bates*, 212 Ill. 2d 489, 515 (2004). Whether a substantial change in circumstances has occurred that would warrant a modification of parenting time is a factual inquiry. As such, a review of a trial court's determination as to the existence of a substantial change of circumstances warranting modification is done under the manifest weight of the evidence standard. See *In re Marriage of Burns*, 2019 IL App (2d) 180715, ¶ 24; *In re Marriage of Bates*, 212 Ill. 2d at 515-16.

> "The trial court is in the best position to review the evidence and to weigh the credibility of the witnesses. [Citation.] In determining whether a judgment is contrary to the manifest weight of the evidence, the reviewing court views the evidence in the light most favorable to the appellee. [Citation.] Where the evidence permits multiple reasonable inferences, the reviewing court will accept those inferences that support the court's order. [Citation.] A [modification] determination, in particular, is afforded 'great deference' because 'the trial court is in a superior position to judge the credibility of the witnesses and determine the best interests of the child.' [Citation.]" *In re Marriage of Bates*, 212 Ill. 2d at 515-16.

Ultimately, "[a] decision is against the manifest weight of the evidence only when an opposite conclusion is clearly apparent or when the court's findings appear to be unreasonable, arbitrary, or not based upon the evidence." *In re Marriage of Romano*, 2012 IL App (2d) 091339, ¶ 44.

¶ 46    Section 610.5(c) of the Act governs the modification of parental responsibilities and provides as follows:

> "[T]he court shall modify a parenting plan or allocation judgment when necessary to serve the child's best interests if the court finds, by a preponderance of the evidence, that on the basis of facts that have arisen since the entry of the existing parenting plan or allocation judgment or were not anticipated therein, *a substantial change has occurred in the circumstances of the child or of either parent and that a modification is necessary to serve the child's best interests*." (Emphasis added.) 750 ILCS 5/610.5(c) (West 2018).

¶ 47    Thus, in order for the trial court to grant the relief Quentin sought under his second amended petition to modify, Quentin had to prove by a preponderance of the evidence, first, that a substantial change had occurred in the circumstances of the child or of either parent, and second, that a modification was necessary to serve the child's best interests.

¶ 48    Quentin's personal testimony regarding a substantial change was that the children had gotten older and were now involved in various school and extracurricular activities; he was now married and the children had grown closer to him with their increase in age; Ginger had moved approximately 10 miles away from where she resided at the time of the divorce and, as a result, the children changed school districts; Ginger and Quentin had communication issues; Ginger had been discouraging or refusing to sign the children up for activities they wanted to participate in; and Ginger had refused and frustrated Quentin's attempts to speak to his children on the phone when they were not with him which was affecting his relationship with them.

14

¶ 49 However, Ginger testified that the allegations Quentin had brought before the court were unfounded. She testified that she communicated with Quentin when needed regarding various aspects of the children's lives. She further testified that she did not prevent the children from speaking with Quentin on the phone, but actually brought the phone to them on occasions and asked them to speak to him. She was also the parent who provided S.V.'s cell phone to her for much of the complained of period. She testified that she felt harassed by Quentin during various interactions and as a result she did not share her personal cell phone number with him but communicated through e-mail so things were in writing. She testified that while the children have in the past participated in various sports, they have expressed to her that they no longer wish to participate in certain ones. She testified that she did take the children to activities during her time.

¶ 50 After hearing the evidence put forth by Quentin over the period of two days, the trial court found that Quentin failed to produce sufficient evidence to support a finding of a substantial change in circumstances or that a modification was necessary to serve the best interests of the children. This is the type of case often placed before trial courts where the parties present differing versions of events and interactions. That is why our courts have regularly held that "[a] [modification] determination *** is afforded 'great deference' because 'the trial court is in a superior position to judge the credibility of the witnesses and determine the best interests of the child.' [Citation.]" *In re Marriage of Bates*, 212 Ill. 2d at 516. "A decision is against the manifest weight of the evidence only when an opposite conclusion is clearly apparent or when the court's findings appear to be unreasonable, arbitrary, or not based upon the evidence." *In re Marriage of Romano*, 2012 IL App (2d) 091339, ¶ 44.

¶ 51 Considering the evidence above, we do not find that the "opposite conclusion is clearly apparent" or that trial court's determination was "unreasonable, arbitrary, or not based on the

15

evidence." When viewing the evidence in the light most favorable to the appellee, Ginger, the only possible "substantial change in circumstances" presented could be Ginger's move into a new residence which resulted in a change in school districts for the children. However, this move was only 10 miles away from her previous residence. Further, Quentin put forth little evidence of how this change negatively impacted the children or how it prevented the parties from being able to operate under the allocation order that he sought to modify. In fact, the trial court stated the following after its finding of directed verdict for Ginger: "There's not been a substantial change in circumstances proven here. There's not been a substantial change in circumstance. These kids are doing wonderfully well." We also note Quentin's own testimony when asked about how the change in school districts impacted his ability to participate in the children's activities. He replied, "It does make it a little tougher." The trial court apparently felt that this was not enough to warrant a "substantial change in circumstances," and we will not second-guess the trial court, which holds a superior position to evaluate testimony to this court. A parent relocating 10 miles away and a change in school districts where the children are succeeding is not sufficient to constitute a substantial change in circumstances to warrant a modification that would move the majority of parenting time from one parent to another.

¶ 52    Thus, we find the trial court did not err in directing a verdict in favor of Ginger on the second amended petition to modify.

¶ 53        B. Whether the Circuit Court Erred in Its Sanctioning of Quentin for Filing

"Frivolous and Repeated" Petitions to Modify

¶ 54    We now turn to the second issue on appeal, whether the trial court erred when it sanctioned Quentin under section 610.5(f) of the Act for filing "frivolous and repeated" petitions for modification.

16

¶ 55 "We recognize that a trial court's determination regarding a motion for sanctions is a matter within the court's discretion and will not be disturbed absent an abuse of that discretion." *Wittekind v. Rusk*, 253 Ill. App. 3d 577, 581 (1993). "However, a court abuses its discretion when its decision is based upon a misapplication of law." *In re Marriage of Burns*, 2019 IL App (2d) 180715, ¶ 24.

¶ 56 The trial court issued sanctions pursuant to section 610.5 of the Act that reads, in relevant part, as follows: "If the court finds that a parent *has repeatedly filed frivolous motions for modification*, the court may bar the parent from filing a motion for modification for a period of time." (Emphasis added.) 750 ILCS 5/610.5(f) (West 2018). Based upon the plain language of the statute as emphasized above, in order for a trial court to bar a parent from filing a motion for modification for a period of time, it would need to find two things: (1) that the parent has filed "repeated" or multiple motions for modification and (2) that those motions for modification have been "frivolous" or without merit.

¶ 57 Both elements were noted in the trial court's April 24, 2020, order when it found that Quentin's "filings of Petition to Modify have been *frivolous and repeated* and hereby bars [Quentin] from filing future Petitions to Modify." (Emphasis added.) However, while neither party addresses the issue in his or her brief, this court fails to see how Quentin has filed "repeated" motions to modify.

¶ 58 As noted in our facts section, Quentin filed his first petition *pro se*. He then hired an attorney who properly amended the *pro se* petition to plead his client's case more aptly. Then a second amended petition was filed, adding allegations that Quentin believed supported his position.[1] At no point in the record was there a ruling on the merits of any of these filings prior to

---

[1]We also note that the record on appeal lacks any documentation demonstrating that Quentin sought leave to amend from the trial court before filing his amended petitions. However, none of those petitions were challenged while in the trial court, and therefore, any challenges are waived. ("Generally, pleading defects must be raised at trial so that they may be remedied; otherwise, the defects are waived." *In re Andrea*

17

the trial. Further, the amended petitions contained generally the same allegations throughout and sought generally the same relief. While we are not aware of a case specifically on point in relation to petitions to modify, in *Stalder v. Stone*, 412 Ill. 488, 495 (1952), an adoption case, the Illinois Supreme Court held that an amendment of a petition for adoption that included some additional facts regarding a parent's character did not constitute a new cause of action as long as the allegations and claims were essentially the same in both original and amended petitions. We find this analogous to the situation here. Where an amendment merely attempts to bring the pleading up to date with available evidence and the "gist" of the complaint brought by petitioner seeking to modify is generally the same, an amended filing does not constitute a new cause of action.

¶ 59 We do acknowledge that Quentin filed at least nine different motions or filings during the pendency of his petition to modify, some of which the trial court may have considered frivolous. However, the statute's language expressly limits the trial court's consideration to "motions for modification." 750 ILCS 5/610.5(f) (West 2018).

¶ 60 Thus, because Quentin had filed only one petition to modify (which was merely amended multiple times) at the time the trial court issued its sanction, the "repeated" element was not met. Therefore, we vacate the trial court's sanctions against Quentin.

¶ 61 C. Whether the Circuit Court Erred in Finding That Quentin Failed to Present Sufficient

Evidence That Ginger Violated the Terms of the Court's Allocation Order

¶ 62 The third issue is whether the trial court erred by not finding Ginger in indirect civil contempt for failure to abide by the court's allocation order concerning communication with the children. "[W]hether a party is guilty of contempt is a question of fact for the trial court, *** a reviewing court will not disturb the finding unless it is against the manifest weight of the evidence

---

*D.*, 342 Ill. App. 3d 233, 242 (2003).)

18

or the record reflects an abuse of discretion." *In re Marriage of Logston*, 103 Ill. 2d 266, 286-87 (1984). "A decision is against the manifest weight of the evidence only when an opposite conclusion is clearly apparent or when the court's findings appear to be unreasonable, arbitrary, or not based upon the evidence." *In re Marriage of Romano*, 2012 IL App (2d) 091339, ¶ 44.

¶ 63 "Generally, civil contempt occurs when a party fails to do something ordered by the trial court, resulting in the loss of a benefit or advantage to the opposing party." *Cetera v. DiFilippo*, 404 Ill. App. 3d 20, 41 (2010). Importantly, in order to support a finding of contempt, the order at issue must be "so specific and clear as to be susceptible of only one interpretation." *O'Leary v. Allphin*, 64 Ill. 2d 500, 514 (1976). "It must not only be capable of reasonable interpretation, but that interpretation must be to the exclusion of other reasonable interpretations; it must be unambiguous." *O'Grady v. Cook County Sheriff's Merit Board*, 204 Ill. App. 3d 258, 262 (1990).

¶ 64 In this case, Quentin asserts that Ginger violated a provision of the allocation order entered by the trial court on August 3, 2016, specifically, section E(3). That section reads as follows:

> "Communication between parent and children shall be as follows: During Mother's parenting time, Father shall be able to communicate with the minor children via phone at reasonable times, but he shall not attempt contact after 8:00 p.m. *** In the event that a parent attempts to contact the children, the parent with whom the children are with shall make the children aware that the other parent has attempted the contact and shall telephone the other parent back as soon as practicable."

¶ 65 In section E(2) of the allocation order, it is also directed that the "parents shall communicate regarding the care and well being of the minor children via text messaging and email."

¶ 66 Quentin's first assertion is that Ginger violated the order by not giving him her personal cell phone number so that he can call her directly. We find the above language in section E(2) of

19

the allocation order to be telling in that the trial court has clearly articulated that the parties should correspond and communicate, when possible, in a manner that is written or documented. Nowhere in the order does it explicitly require Ginger to give Quentin her personal cell number. As testified to by Ginger, Quentin had her work cell phone number and her personal and work e-mail addresses. Ginger testified that, on occasion, Quentin has harassed her via her work phone and other means. As a result, she testified that she refused to give Quentin her personal cell phone number and strictly used e-mail in an attempt to keep everything in writing and prevent such harassment from reoccurring. We do note that Quentin was found in indirect civil contempt of court twice shortly following the initial entry of the allocation order, once for failure to pay child support and once for violation of the allocation order.

¶ 67    Additionally, it is important to view the allocation order in the context of the world we live in today. It is common for individuals to have cell phones that can send and receive e-mails. Thus, whether the parties text or e-mail is virtually irrelevant; the mechanisms work similarly and allow for immediate communication in writing. Thus, Quentin's allegation that Ginger violated the allocation order by not divulging her cell phone number to him is negated by the specificity requirements of the law as set forth in *O'Leary* and *O'Grady*. See *O'Leary*, 64 Ill. 2d at 514; *O'Grady*, 204 Ill. App. 3d at 262. Simply put, the order nowhere explicitly requires Ginger to give her phone number to Quentin, but it does explicitly outline communication via e-mail which is what the evidence showed was used by the parties.

¶ 68    Quentin also alleged that Ginger violated section E(3) of the allocation order by not calling Quentin back on occasions where he called the children but was unable to talk to them. Specifically, Quentin states that her failure to do so violated the following portion: "In the event that a parent attempts to contact the children, the parent with whom the children are with shall

make the children aware that the other parent has attempted the contact and shall telephone the other parent back as soon as practicable."

¶ 69    First, we note that S.V., the eldest child, had at least one cell phone provided to her by Ginger for the purpose of communicating with Quentin. The testimony at trial from Ginger on this issue was that when Quentin called S.V.'s phone, S.V. did not always answer. Ginger testified that if she witnessed Quentin call S.V.'s phone, Ginger took the phone to S.V. and told her to call Quentin back. She testified that she encouraged the children to call Quentin back when they missed his calls and that, on some occasions, she has dialed Quentin back on S.V.'s phone and handed S.V. the phone. However, S.V. sometimes would hang up the phone or indicate that she did not want to speak with Quentin at that time.

¶ 70    Again, this is another scenario where the trial court had to make a factual determination where the parties presented differing versions of events and interactions. That is why our courts have put in place deferential standards when reviewing trial court determinations. See *In re Marriage of Bates*, 212 Ill. 2d at 515-16; *In re Marriage of Logston*, 103 Ill. 2d at 286-87. Considering the evidence above, when viewed in the light most favorable to Ginger and inferences that are favorable to the trial court's ruling (*In re Marriage of Bates*, 212 Ill. 2d at 516), we do not find that the "opposite conclusion is clearly apparent" or that trial court's determination was "unreasonable, arbitrary, or not based on the evidence." Therefore, we do not find that the trial court erred in finding that Quentin failed to show that Ginger violated the allocation order.

¶ 71    D. Whether the Circuit Court Erred in *Sua Sponte* Granting Additional Parenting Time to

Quentin Following Its Dismissal of His Second Amended Petition to Modify

¶ 72    The fourth issue before us is whether the trial court's *sua sponte* granting of additional

parenting time to Quentin following its directed finding in favor of Ginger on the second amended

petition to modify was proper.

¶ 73    " '[T]he standard of review for modification of a child-custody order after a dissolution

judgment becomes final is whether the modification is against the manifest weight of the evidence

or an abuse of discretion.' " *In re Marriage of Burns*, 2019 IL App (2d) 180715, ¶ 24 (quoting

*In re Marriage of Kading*, 150 Ill. App. 3d 623, 631 (1986)). "However, a court abuses its

discretion when its decision is based upon a misapplication of law." *Id.*

¶ 74    Following the trial court's granting of directed verdict in favor of Ginger on Quentin's

second amended petition to modify, the trial court entered a "minor modification" granting

Quentin additional overnight stays with the children, resulting in approximately 13 days of

parenting time. As a basis for its ruling, the trial court relied on section 610.5(e)(2), which reads

as follows:

"(e) The court may modify a parenting plan or allocation judgment without a

showing of changed circumstances if (i) the modification is in the child's best interests;

and (ii) any of the following are proven as to the modification:

***

(2) the modification constitutes a minor modification in the parenting plan

or allocation judgment[.]" 750 ILCS 5/610.5(e)(2) (West 2018).

¶ 75    Quentin asserts that the modification of additional parenting time constitutes a minor

modification under section 610.5(e)(2) of the Act and is proper. However, Ginger argues that

22

section 2-1110 of the Code of Civil Procedure (735 ILCS 5/2-1110 (West 2018)), pursuant to which the trial court directed the verdict against Quentin, required that the action be dismissed and ended. In the alternative, Ginger argues that the modification was not "minor" as allowed for pursuant to section 610.5(e)(2) (750 ILCS 5/610.5(e)(2) (West 2018)). The applicable part of section 2-1110 reads as follows:

> "In all cases tried without a jury, defendant may, at the close of plaintiff's case, move for a finding or judgment in his or her favor. In ruling on the motion the court shall weigh the evidence, considering the credibility of the witnesses and the weight and quality of the evidence. *If the ruling on the motion is favorable to the defendant, a judgment dismissing the action shall be entered.*" (Emphasis added.) 735 ILCS 5/2-1110 (West 2018).

¶ 76    We note that this issue is a matter of first impression within the Fifth District Appellate Court. In *In re Marriage of Burns*, 2019 IL App (2d) 180715, our colleagues in the Second District addressed a nearly identical issue as the one presented before us. In that case, a father petitioned the court for modification of an allocation order alleging a substantial change in circumstances had occurred that warranted modification of parenting time. At the close of father's case-in-chief, mother moved for a directed verdict, arguing that father had failed to prove a substantial change in circumstances affecting the overall welfare of the children. In *Burns*, the trial court granted the directed verdict " 'in part' " and then proceeded to *sua sponte* modify the parties' parenting time. *Id.* ¶ 3. Mother appealed, arguing that once the trial court found that father failed to establish his *prima facie* case that a substantial change in circumstances existed, and granted her motion for directed verdict, the case should have terminated, and the trial court lacked authority to modify the parenting plan. *Id.* ¶ 19.

¶ 77    The appellate court in *Burns* reversed the trial court and held as follows:

"Here, the court granted [mother's] motion, finding that [father] failed to prove a 'significant change in circumstances' that affected the 'overall welfare of the children.' Thus, the court found that [father] failed to establish *both* prerequisites for relief under his petition, *i.e.*, a *prima facie* case. That decision should have terminated the case. See 735 ILCS 5/2-1110 (West 2016) ('if the ruling on the motion is favorable to the defendant, *a judgment dismissing the action shall* be entered' (emphasis added)). Indeed, the court's ruling did terminate the case in the sense that the hearing ended, and no further evidence was received. However, the ruling did not 'dismiss' or terminate the action in the sense that, despite finding that a *prima facie* case was not established, the court nevertheless entered relief under the petition. This court has not been presented with (or found) a case in which a court granted a motion for a directed finding on the basis that the opponent failed to establish a substantial change in circumstances warranting modification of an agreement, but nevertheless modified the agreement. We find that the court's granting a directed finding 'in part' was improper." (Emphasis in original.) *Id.* ¶ 27.

¶ 78 The *Burns* court went on to discuss whether the trial court had authority to modify the allocation order under section 610.5(e)(2), which allows for modification of a parenting plan if " 'the modification constitutes a minor modification in the parenting plan or allocation judgment.' " *Id.* ¶ 28 (quoting 750 ILCS 5/610.5(e)(2) (West 2016)). The court stated: "Even if, theoretically, the court *could* have granted the motion in part," the modifications made by the trial court *sua sponte* were not minor. (Emphasis in original.) *Id.* ¶ 28. "A 'minor' modification is 'small' or 'inconsequential.' " *Id.* ¶ 29. "We apply this provision narrowly, so as to comport with the Act's policy favoring the finality and continuity of parenting plans." *Id.* The court then

articulated that the modifications were not minor because they made substantial changes to summer parenting time and required mother to drive to a different state for some exchanges. *Id.*

¶ 79 Finally, the *Burns* court stated: "In any event, we agree that due process was violated. Specifically, although [mother] was aware that [father] wanted parenting time modified, as to the modifications ordered *sua sponte* by the *court*, [mother] was not given notice and an opportunity to be heard." (Emphasis in original.) *Id.* ¶ 31.

¶ 80 We agree with the above analysis and, thus, find that the trial court's modifications in this matter were not proper.

¶ 81 In this case, Quentin alleged a substantial change in circumstances warranting modification of parenting time and requested that the parenting plan be modified so that he be awarded the majority of parenting time. Following Quentin's presentation of evidence, the trial court determined: "There's not been a substantial change in circumstance. These kids are doing wonderfully well." Thus, at the close of evidence, the trial court found that Quentin failed to prove his *prima facie* case that a substantial change existed or that modification was necessary to serve the children's best interests. The trial court then properly granted Ginger's motion for directed verdict pursuant to section 2-1110 and dismissed the action "with prejudice" as discussed previously. Additionally, the trial court went so far as to issue section 610.5(f) sanctions against Quentin for filing "frivolous" petitions to modify. It is at this point that the trial court should have terminated all matters as it related to modification of parenting time and the case should have ceased.

¶ 82 Instead, following the dismissal, the trial court *sua sponte* proceeded to inquire about modifying the provisions of the parenting plan, asking the parties to brief him on his authority to

make a minor modification to the parenting time in light of the law as articulated in *Burns* and section 610.5(e). See *id.* ¶ 24.

¶ 83    Following briefing by both parties on the minor modification issue, the trial court in its April 24, 2020, order found that "a minor modification of the parenting time portion of the order [was] necessary as [Ginger] has moved outside of the children's previous school district and further away from Quentin." The trial court then went on to modify the parenting plan so that Quentin's parenting time would be extended from Sunday evening until Monday morning during his scheduled parenting time every other weekend. Thus, the trial court granted Quentin an additional overnight stay with the children every other week, allowing Quentin approximately 13 additional days a year of parenting time. Here, the trial court erred.

¶ 84    The trial court's basis for its section 610.5(e)(2) minor modification to the parenting plan was Ginger's change of residence and the children's change of school district. However, these were two of the main allegations made in Quentin's second amended petition to modify ("G. Mother has moved and enrolled the minor children in Eldorado schools grades 7th and 2nd"; "I. Mother's move creates an issue with Father's parenting time at pick-up from school"). This court simply cannot bring into harmony the trial court's granting of directed verdict and sanctions for frivolous filings against Quentin based upon these claims and then its reliance on those very claims to turn around and "*sua sponte*" modify the allocation order in favor of Quentin. What we are left with is the same finding the trial court had in *Burns*: a granting of a motion for directed verdict " 'in part,' " which is improper. *Id.* ¶ 27.

¶ 85    However, assuming *arguendo* that the trial court did have the authority to find that Ginger's change of residence and the children's change of school did not constitute a substantial change, but did give grounds for a minor modification, this court would not find the granting of an

26

additional overnight stay every other weekend to be "minor." In addition to our reliance on *Burns*, we turn to a Fourth District case, *In re Marriage of O'Hare*, 2017 IL App (4th) 170091, for further support of this determination.

¶ 86 In *O'Hare*, the parties' allocation order gave 56% of the parenting time to mother and the remaining 44% of parenting time to father. *Id.* ¶ 5. Father filed an amended motion to modify, which proposed a modification that "would increase [father's] parenting time by 6% and would result in [the parties] sharing parenting time equally, 50% apiece." *Id.* ¶ 10. Mother then filed "a motion to dismiss the motion to modify parenting time, alleging that (1) [father] failed to allege a change of circumstances and (2) the modification sought was not a minor modification as contemplated by section 610.5(e)(2) of the *** Act." *Id.* ¶ 11. "Later that month, the trial court granted [mother's] motion to dismiss, finding that 'an additional overnight every 14 days is not a minor modification as contemplated by 750 ILCS 5/610.5(e).' " *Id.*

¶ 87 On appeal, the Fourth District Appellate Court noted, "In January 2016, the Illinois General Assembly amended section 610.5 of the *** Act to allow modification of parenting time absent a substantial change in circumstances in limited situations." *Id.* ¶ 17. The *O'Hare* court then reviewed the trial court's decision in light of the newly amended section 610.5(e) of the Act. The court noted that "the term 'minor' is synonymous with 'small' or 'inconsequential' " and then went on to reject father's argument that his request, which "would change the parenting plan from one parent serving as the primary custodial parent to both parents having equal parenting time," constituted "a minor modification within the meaning of section 610.5(e) of the *** Act." *Id.* ¶ 27. The court further noted that its interpretation was supported by the Act's "policy favoring the finality of the order outlining the parenting plan." *Id.* ¶ 28.

¶ 88    Therefore, because an additional half-month with or without one's child is not "inconsequential," we find, in accord with *O'Hare*, that "an additional overnight every 14 days is not a minor modification as contemplated by 750 ILCS 5/610.5(e)." (Internal quotation marks omitted.) *Id.* ¶ 11.

¶ 89    Finally, we also note that the manner in which the trial court handled this modification raises concerns as to whether Ginger's due process rights were violated. As was highlighted in *Burns*, though Ginger prevailed on her motion for directed verdict, that ruling acted to her detriment because the trial court ceased hearing evidence from the parties, and instead of dismissing the matter, *sua sponte* removed parenting time from Ginger. Thus, she was not afforded the opportunity to present evidence against modification, major or minor. See In *re Marriage of Burns*, 2019 IL App (2d) 180715, ¶ 31.

¶ 90    Here, Quentin did not seek relief pursuant to section 610.5(e)(2), which allows a court to make a minor modification without a finding of a substantial change in circumstances. 750 ILCS 5/610.5(e)(2) (West 2018). Instead, Quentin brought his petition to modify pursuant to section 610.5(c), which allows for modification only after a finding of substantial change in circumstances. *Id.* § 610.5(c). Quentin's failure to seek relief pursuant to section 610.5(e)(2) either solely, or in the alternative, denied Ginger notice. The trial court's entry of a minor modification *sua sponte*, without Ginger having an opportunity to first present her case, denied her the right to be heard. Thus, the lack of notice of the potential minor modification, without an opportunity to be heard on that particular issue, creates due process concerns. See *Burns*, 2019 IL App (2d) 180715, ¶ 31.

¶ 91    Therefore, for the foregoing reasons, we find the trial court erred in *sua sponte* modifying the allocation order and we vacate the modifications.

¶ 92     E. Whether the Circuit Court Erred in Denying Ginger's Request for Sanctions

Pursuant to Illinois Supreme Court Rule 137

¶ 93     The final issue before this court is whether the trial court's denial of Ginger's request for

sanctions pursuant to Illinois Supreme Court Rule 137 (eff. Jan. 1, 2018) was improper in light of

Quentin's frivolous filings.

¶ 94     "In reviewing a decision on a motion for sanctions, we must primarily determine whether

the trial court's decision was informed, based on valid reasons, and whether the decision followed

logically from the application of the reasons stated." *Thomas Hake Enterprises, Inc. v. Betke*, 301

Ill. App. 3d 176, 182 (1998). "The trial court's determination regarding a motion for sanctions is

a matter within the court's discretion and will not be disturbed absent an abuse of that discretion."

*Id.* "An abuse of discretion will be found only where a trial court has made a decision no reasonable

person could make. Where reasonable people could differ as to the propriety of the trial court's

action, there has been no abuse of discretion." *In re Marriage of Sykes*, 231 Ill. App. 3d 940, 947

(1992). "A party seeking the imposition of Rule 137 sanctions against an opponent is the burdened

party ***." *In re Marriage of Schneider*, 298 Ill. App. 3d 103, 109 (1998).

¶ 95     Rule 137 reads, in relevant part:

"The signature of an attorney or party constitutes a certificate by him that he has read the

pleading, motion or other document; that to the best of his knowledge, information, and

belief formed after reasonable inquiry it is well grounded in fact and is warranted by

existing law or a good-faith argument for the extension, modification, or reversal of

existing law, and that it is not interposed for any improper purpose, such as to harass or to

cause unnecessary delay or needless increase in the cost of litigation. *** If a pleading,

motion, or other document is signed in violation of this rule, the court, upon motion or

29

upon its own initiative, may impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of reasonable expenses incurred because of the filing of the pleading, motion or other document, including a reasonable attorney fee." Ill. S. Ct. R. 137 (eff. Jan. 1, 2018).

¶ 96 Ginger asserts that the purpose of Rule 137 is to sanction "frivolous" pleadings and that because the trial court "found Quentin's pleadings to be 'frivolous and repeated' *** and given the trial court did not vacate that finding, the trial court erred when it did not award Ginger her attorney fees and costs." However, as the language of Rule 137 states, "the court *** *may* impose *** an appropriate sanction." (Emphasis added.) *Id.* The statute does not require an entry of sanctions for frivolous filings, it merely gives the trial court the discretion to issue sanctions if the conduct warrants such a measure. Further, while the trial court did impose sanctions under section 610.5(f) of the Act (750 ILCS 5/610.5(f) (West 2018)), as noted above, that ruling was made in error because there was only one petition to modify.

¶ 97 Here, the court entered the following docket order when it denied Ginger's request for sanctions:

"2) As to the Motion for sanctions, the court finds that the [*sic*] although the evidence presented at trial on the petition to modify resulted in a directed verdict, Mr. Vickers DID NOT file the Petitions to modify with the intent to harass Ms. Lanius [*sic*] and the pleadings were not vexatious. The evidence revealed that there was not a substantial change in cricumstances [*sic*] and a directed verdict was entered in favor of Ms. Lanius [*sic*] at the conclusion of Mr. Vicker's [*sic*] case. THe [*sic*] court even imposed a sacntion [*sic*] under 610.5 (f) concerning Mr. Vicker's [*sic*] ability to file subsequent petitions to modify.

30

Sanctions under Rule 137 are separate and disinct [*sic*] from 750 ILCS 5/610.5(f) sanctions. Under 610.5(f), the court did have the ability to financially santion [*sic*] Mr. Vickers for vexaitous [*sic*] or harassing actions. The court did not and still does not believe that financial sanctions under Rule 137 or section 610.5 (f) are appropriate. Mr. Vickers, in the court's opinion, brought the petitions to modify out of his love for his children and in good faith beleived [*sic*] that a modiification [*sic*] was necessary for their best interests as Ms. Lanius [*sic*] had moved away from Hamilton County with the kids. Mr. Vicker's [*sic*] belief, in the court's opinion, was misguided and not supported by the evidence at trial. This court also found the action to be frivilous [*sic*] as defined only by 750 ILCS 5/610(f). The court did not and does not find, however, that the actions were commenced with the intent to harass or were vexatious in any way. The court should only reserve Rule 137 sanction for the most agregious [*sic*] cases. The court beleives [*sic*] that Rule 137 sanction ARE NOT WARRANTED AT THIS TIME. IT IS SO ORDERED. JUDGE EVAN L. OWENS."

¶ 98   After review of the record before us and considering the deferential standard of review, we find that the trial court's reasoning for denying sanctions was not unreasonable and, thus, do not find that the trial court's denial of Rule 137 sanctions against Quentin was an abuse of discretion.

¶ 99                                III. CONCLUSION

¶ 100   For the foregoing reasons, we affirm in part and vacate in part the final orders of the circuit court of Hamilton County entered on April 24, 2020. Specifically, we (1) affirm the trial court's directing verdict in favor of Ginger on Quentin's second amended petition to modify and subsequent dismissal, (2) vacate the trial court's entry of sanctions against Quentin pursuant to section 610.5 of the Act for filing "frivolous and repeated" petitions to modify, (3) affirm the trial

31

court's finding that Quentin failed to present sufficient evidence that Ginger violated the terms of the trial court's allocation order concerning communication with the children, (4) vacate the trial court's *sua sponte* modification of the allocation order granting Quentin additional parenting time, and (5) affirm the trial court's denial of Ginger's request for Rule 137 sanctions against Quentin.

¶ 101   Affirmed in part and vacated in part.

**No. 5-20-0164**

| | |
|---|---|
| **Cite as:** | *In re Marriage of Vickers*, 2022 IL App (5th) 200164 |
| **Decision Under Review:** | Appeal from the Circuit Court of Hamilton County, No. 13-D-16; the Hon. Evan L. Owens, Judge, presiding. |
| **Attorneys for Appellant:** | Bryan A. Drew, of Drew Law Group, of Benton, for appellant. |
| **Attorneys for Appellee:** | Gregory K. Stewart, of Conger & Elliott, P.C., of Carmi, for appellee. |

33