2025 IL App (1st) 241296-U

Fourth Division
Filed January 9, 2025

No. 1-24-1296

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent
except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | |
|---|---|
| *In re* MARRIAGE OF | ) |
| LAURA HAYDEN, | ) Appeal from the |
|     Petitioner-Appellant | ) Circuit Court of Cook County |
| | ) |
| and | ) No. 2021 D 000650 |
| | ) |
| DAVID P. HAYDEN JR., | ) The Honorable Pamela E. Loza, |
|     Respondent-Appellee. | ) Judge, presiding. |
| | ) |

JUSTICE OCASIO delivered the judgment of the court.
Presiding Justice Rochford and Justice Lyle concurred in the judgment.

**ORDER**

¶ 1    *Held:*  The trial court's judgment allocating parental responsibilities and setting child support
was affirmed where all of mother's claims of error were forfeited, based on matters
not shown by the incomplete record, or otherwise without merit.

¶ 2    Laura Hayden appeals from a judgment dissolving her marriage to David P. Hayden Jr.,
setting child support, and allocating parental decision-making authority under the Illinois Marriage
and Dissolution of Marriage Act (Marriage Act) (750 ILCS 5/101 *et seq.* (West 2022)).
Representing herself on appeal, Laura makes several allegations of error. As we explain in the
analysis section below, we do not consider several of those arguments—Laura has forfeited some
of them by not including necessary information in her brief, and we cannot evaluate many others

because the record is incomplete—and the arguments that we are able to consider lack merit. For those reasons, we are affirming the trial court's judgment.

¶ 3  A preliminary note. Our decision in this accelerated appeal was due on November 18, 2024. See Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). Laura's brief was originally due on August 5, three weeks after the record on appeal was filed. See Ill. S. Ct. R. 311(a)(7) (eff. July 1, 2018). However, the record did not include a report of proceedings, and Laura asked for a series of extensions so she could present bystander's reports to the circuit court for certification. That process took longer than it should have because the judge who presided over this case in the circuit court was assigned to a different call in a different courthouse. Ultimately, the circuit court did not rule on whether to certify the bystander's reports until October 8, at which point we set a briefing schedule that conformed to Rule 311(a)(7) except that it used October 8 as the baseline. We later allowed Laura an additional 15-day extension based on her representation that a family emergency prevented her from filing her brief on time. We also gave Laura additional time to file a reply brief after David filed his brief *instanter*, causing additional delay. Between Laura's efforts to provide a complete record on appeal, though ultimately unsuccessful, her family emergency, and the goal of giving both parties a full opportunity to be heard, we find that there is good cause for not deciding this case by November 18, 2024. See Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018).

¶ 4                                    I. BACKGROUND

¶ 5  Laura and David were married in 2018. Their marriage produced one son, J.H., who was born in December 2018. The record discloses that Laura's son from a previous relationship, Z.R., also lived with them before the couple separated. In January 2021, Laura filed a dissolution petition alleging irreconcilable differences. The case was assigned to Judge Pamela E. Loza, who presided over all the relevant proceedings except for two, which we note below.

¶ 6  The matter was still pending on July 29, 2022, when Laura filed a petition for an emergency order of protection. She alleged, among other things, that David had removed J.H. from day care two weeks earlier, had not yet returned J.H., and had blocked all communications from her.

Additionally, she alleged that J.H. had "recently exhibited signs of sexual inappropriation [*sic*]." The petition was heard by Judge Jonathan Clark Green, who granted it and entered an emergency order of protection that, among other things, granted physical care and possession of J.H. to Laura and ordered David to return J.H. by bringing him to the day care the following Monday morning, August 1.

¶ 7     The next hearing was on August 12, back before Judge Loza. The record does not include a transcript of the hearing, but two events of significance happened. First, the court modified the emergency order of protection to provide that "[Z.R.] shall be kept away from [J.H.] until further order of the Court." Second, the court appointed attorney Arlette Porter to serve as guardian *ad litem* for J.H. on two issues: "[a]lleged sexual abuse by brother who also resides with Mom" and "parenting time and allocation of decision making."

¶ 8     A hearing on whether to issue a plenary order of protection took place via videoconference on August 19, one week later. David appeared personally and through counsel, and Laura appeared *pro se*. After being sworn, Laura stated that the basis for the order of protection was that David had taken J.H. on the road in his 18-wheeler for three weeks. She asserted that, during this time, David had "decided to open up a false investigation with no facts" based on "sudden *** allegations of improper behavior." At the end of the hearing, the court dismissed the petition. It remarked that it was "completely inappropriate" for "a three-year-old to be traveling in an 18-wheeler," but it found that there was no evidence of any abuse or stalking that would justify an order of protection. It noted for the record that it had appointed a guardian *ad litem* because there were "allegations, sexual allegations going back and forth between the parties." It also reaffirmed its order that Z.R. and J.H. were to remain separated. Four days later, on August 23, the court entered a written order memorializing its ruling on the order of protection and specifying that "[Z.R.] shall be kept away from [J.H.] until further order of the Court."

¶ 9     A few months later, on December 9, 2022, the court entered three orders that are relevant to this appeal. First, it ordered the Cook County Department of Adoption and Family Supportive Services to do a "home-based social investigation" for each party and provide recommendations

on parenting time, parenting responsibilities, and "the safety of the minor child" at each party's home. Second, it entered an interim child-support order providing for David to make payments of $325 twice per month. Third, it ordered both parties to complete an online parent-education course and to participate in mediation on the issues of parenting time and allocation of parental responsibilities. On February 3, 2023, Laura filed a certificate of completion for the parenting course. The record does not include a certificate of completion for David.

¶ 10     On October 10, 2023, David asked the court to require Laura to submit to a test for phosphatidylethanol (PEth), which is a direct alcohol biomarker, under Illinois Supreme Court Rule 215 (eff. Jan. 1, 2018). David alleged that Laura had a history of abusing alcohol and that she was currently abusing alcohol, and he argued that evaluating her for alcohol dependence would be relevant to the court's determination of parenting time and decision-making responsibility.

¶ 11     The court held a hearing on December 7, 2023, on David's petition for PEth testing and other outstanding matters. As relevant here, the court ordered both parties to undergo PEth testing by December 8, and it set a trial date in early April.

¶ 12     On January 19, 2024, the guardian *ad litem* filed an emergency motion to transfer J.H. to David's care and possession and to limit Laura to supervised parenting time. The motion alleged that, despite the court's separation order, J.H. had told the guardian *ad litem* that Z.R. played video games with him, that he and Z.R. played with Christmas toys together, and that Z.R. had struck him in the head. It also alleged that she had not been able to meet with J.H. at Laura's residence or ascertain his living conditions there because her efforts to visit Laura's residence had "been meet with strong resistance." Additionally, it alleged that Terry Smith, a man whom Z.R. supposedly stayed with while J.H. was in Laura's care, had been in custody since November 2023 (after being charged with domestic battery against Laura), that J.H. had "recently contracted a serious case of impetigo," which was not treated, and that J.H. had "presented with bruises, toe fungus, chapped lips, dirty ears and a distinct body odor" during the preceding months. Lastly, the motion alleged that Laura had not completed PEth testing until 21 days after the deadline set by the court and had

claimed to be unable to forward the results of that test—which were positive for PEth—to David or to the guardian *ad litem*.

¶ 13    Six days later, on January 25, David filed a similar emergency motion asking the court to transfer J.H. to his possession, give him sole decision-making authority, and limit Laura to supervised parenting time. In addition to the facts alleged by the guardian *ad litem*, David alleged that Laura had withheld J.H. from him between December 18 and January 4.

¶ 14    After a hearing held the next day, January 26, the court found that Laura had failed to keep Z.R. and J.H. apart, failed to protect J.H. from Z.R.'s abuse, failed to seek appropriate medical and dental care for J.H., allowed J.H.'s impetigo to go untreated, failed to practice good hygiene standards for J.H., failed to submit to the PEth test in the time ordered, and—despite the 21-day delay—"still had a significantly high amount of residual alcohol in her system," according to the results. It ordered that J.H. be transferred to David's possession and awarded David sole care, control, and decision-making authority concerning healthcare, education, and extracurricular activities. It also limited Laura to supervised visiting time and barred her from picking J.H. up from school or day care.

¶ 15    The court held the trial as scheduled on April 2 and 3, 2024. The record does not contain a report of proceedings for the trial, but the court later issued an opinion and judgment that summarized the evidence presented. As recited in the opinion, the evidence relevant to this appeal was as follows.

¶ 16    Laura testified that she worked as a bus driver for the Chicago Transit Authority, where she earned $39 per hour. In 2023, she earned about $57,000. She testified that she was unable to work a full schedule because she needed to take Z.R. to therapy. She described her relationship with Terry Smith (whom she called as a witness) as "complicated."

¶ 17    Laura testified that, when she and David were living together, Laura's son Z.R. lived with them. At some point, a day camp that Z.R. was attending informed Laura and David that Z.R. had engaged in sexually inappropriate conduct with another camper. When Z.R. was in second grade, the school informed Laura and David that Z.R. had acted in a sexually explicit manner toward a

female student. Laura denied knowing about the incidents, and she testified that David was the one who dealt with Z.R.'s issues. In 2021, J.H. reported that Z.R. had touched him inappropriately; at the time, J.H. was three years old and rarely spoke. Ultimately, the court appointed a guardian *ad litem*, and the parties agreed to the court's order to keep the two boys separated.

¶ 18    Laura denied having problems with alcohol. She testified that she delayed taking the court-ordered PEth test because she did not have the money for it. When questioned about the high concentration of PEth found in her blood—her score, the court noted, "indicated significant alcohol issues"—Laura said that she had three or four glasses of wine daily and also drank vodka. She testified that she would not change her lifestyle.

¶ 19    Laura called her cousin Melita Gordon, who testified that she cared for Z.R., including during the 2023 winter break period, and that J.H. was never with Z.R. while she was watching Z.R.

¶ 20    Laura also called her mother, Sherry Blondin, who testified that she sometimes watched Z.R. During the 2023 winter break period, she took care of J.H. at her home in Rockford, and Z.R. was never there with him. Although J.H. later told the guardian *ad litem* that Z.R. hit him while he was at their grandmother's house, Blondin testified that J.H. had actually received a scratch on his back while playing on a treadmill.

¶ 21    Laura's final witness was Terry Smith, who testified that he was a private investigator who lived in the same apartment building as Laura. Between August 2022 and November 2023, Laura engaged his services, paying him about $100 per week. Among other things, Smith took care of Z.R., provided him with a place to sleep, and took him to and from school. Smith also occasionally took J.H. to school. On days where he took both boys to school, he would make separate trips for each one. When Smith was caring for Z.R., Laura would frequently come and spend two to four hours with her son. On November 16, 2023, Z.R. became upset while Smith was watching him, so Smith went to Laura's apartment and had a discussion, after which he was arrested and charged with battery (a charge that was later dismissed). Smith denied having a dating relationship with Laura.

¶ 22    David testified that he has a commercial driver's license (CDL) and worked as a truck driver. In 2023, he made $39,000 as a contract employee. He testified that he and Laura once met with staff at Z.R.'s day camp after Z.R. tried to insert his penis into another child's buttocks, after which Z.R. begin receiving treatment at Mt. Sinai. Later, on two occasions during a trip to Atlanta, he saw Z.R. make a sexually inappropriate gesture. After that, David tried to make sure that Z.R. and J.H. were never together unattended. He and Laura arranged for a babysitter, but one day he came home and found that the babysitter was not there, so he fired her, but Laura rehired her.

¶ 23    David testified that, when J.H. was three years old, he could not speak and communicated by grunting. Before J.H. came to live with David exclusively, when David had parenting time, J.H. would arrive dirty, smelling of body odor, and with dirt-blackened nails and athlete's foot. During David's parenting time, J.H. always reported that Z.R. had hit him. David specifically testified that J.H. told both him and the guardian *ad litem* that during the 2023 winter break, he was with Z.R., who hit him, punched him, and was violent toward him. David testified that, since coming to live with him full time as a result of the court's January 2024 order, J.H. was "thriving." His speech had improved to the point where he could speak clearly, he was more relaxed, he entertained himself when needed, he bathed regularly, and his clothing was kept clean.

¶ 24    David acknowledged having issues with both his physical and mental health. He testified that he had been diagnosed with bipolar disorder and attention-deficit/hyperactivity disorder, for which he took lamotrigine and methylphenidate (Ritalin), but he also testified that his conditions did not hamper his ability to take care of J.H. David also testified that, after he was diagnosed with a heart murmur in October 2022, his CDL was suspended, preventing him from working. He underwent aortic valve surgery in December 2022, and he was able to return to work in 2023 once his CDL was reinstated.

¶ 25    David called his employer, Marcel Geiger, who testified that David worked for him as a contract employee and had returned to work full time after his CDL was reinstated. Geiger described David as a good employee who had worked for him consistently for several years.

¶ 26　　The guardian *ad litem*, Arlette Porter, testified that she made home visits to both parents' residences. David's residence was clean and smelled nice, and J.H. had his own room with books and toys. Laura initially refused to allow Porter to visit her residence and insisted on meeting at a police station. Laura later relented, but she only permitted Porter to see the kitchen, which was disheveled, smelly, a little dirty, and had two roaches climbing on the walls. At both parents' homes, J.H. appeared well-fed. When Porter first saw J.H., he had a speech impediment and communicated by pointing and grunting. After being placed in David's care, J.H. lost his speech impediment and was now communicating verbally. She agreed with David that J.H. was thriving in his care.

¶ 27　　Porter testified that she spoke to David's adult daughter, to Terry Smith, and to Z.R.'s teachers. She also tried to speak to J.H.'s teachers, but they did not return her phone calls. David's daughter said that she sometimes took care of J.H. when David was working overnight; Porter found her to be responsible and appropriate. Smith told Porter that he and Laura were, in the words of the trial court, "paramours." Two of Z.R.'s teachers disclosed that Z.R. had behaved sexually inappropriately with a girl when he was in second grade.

¶ 28　　After hearing the testimony, the court took the matter under advisement.

¶ 29　　About three weeks after trial, on April 22, 2024, Laura filed an emergency motion asking the court to hold David in contempt for interfering with her parenting time. The motion alleged that, on April 16, Laura learned that David had pulled J.H. from his school and his day care without notifying her and that she had not been able to ascertain where J.H. was or how he was doing. The next day, the court ordered David to return J.H. to his usual school and day care facility. At a hearing on David's motion to reconsider, David stated that he had returned J.H. to his original school but not the day care, which he had not used since assuming care and possession of J.H. after the court entered its emergency order in January 2024, and the court accepted that explanation.

¶ 30　　The court issued its opinion and judgment on May 22, 2024. The court dissolved Laura and David's marriage and briefly addressed matters such as maintenance and distribution of property,

which are not at issue in this appeal. Relevant here are the parts of the court's opinion addressing the allocation of parental decision-making and each party's financial responsibilities.

¶ 31    In determining how to allocate decision-making, the court analyzed the statutory best-interest factors. See 750 ILCS 5/602.7(b) (West 2022). Much of that analysis addressed the need to keep J.H. and Z.R. apart. The court found that Laura had "repeatedly demonstrated that she either cannot or does not want to keep J*** and Z separated." It observed that J.H. had repeatedly reported that Z.R. had hit him or behaved in a sexually inappropriate manner, and it found that Laura was aware that Z.R. had engaged in sexually inappropriate behavior not only with J.H. but also at day camp, at school, and on a road trip. Despite the parties agreeing that J.H. should not be left alone with Z.R., the court continued, it had heard "more than ample testimony that on numerous occasions J*** and Z were together unchaperoned," which "[a]ll occurred under [Laura's] watch." The court acknowledged that Z.R.'s circumstances put Laura "in a very untenable position" of needing to find somebody who could care for Z.R. and ensure that he and J.H. remained separated while "she work[ed] nights as a bus driver"—something that did not come cheaply. Ultimately, though, the court determined that Laura's inability to protect J.H. from Z.R. justified restricting her parental responsibilities:

> "Petitioner's inability to keep J*** and Z separated presents a clear danger to J***. The Court believes Respondent has proven by a preponderance of the evidence that Petitioner's failure to keep the boys separated put J*** in physical danger, he has repeatedly been hurt by Z and Z's presence has caused J*** physical and emotional harm. Laura has[,] at times, been unable or unwilling to separate Z and J***.

> * * *

> Petitioner, throughout the pendency of this action has demonstrated that she is unable to keep Z and J*** separated. J*** has complained he has repeatedly been physically assaulted by Z and his assaults were verified by

[the guardian *ad litem*]. Petitioner failed to acknowledge or appreciate the damage Z has done to J***."

¶ 32    The court also determined that there were other factors favoring David. It contrasted Laura's "dirty and smelly" residence, where the guardian *ad litem* had seen cockroaches crawling on a wall, with David's, which "was clean, orderly and smelled well." It also noted that, since J.H. started living with David, his speech and emotional regulation had improved, and he was "thriving" there. In terms of mental and physical health, the court noted that David had been diagnosed with "a bi-polar condition" for which he took Ritalin and lamotrigine and regularly saw both a psychiatrist and a therapist. The results of the PEth test indicated that Laura had an alcohol-abuse problem.

¶ 33    The court addressed other problematic aspects of both David's and Laura's conduct during the pendency of the case. It noted that Laura had repeatedly declined to spend time with J.H., leaving him at her mother's house in Rockford over winter break and not attending any supervised parenting time once J.H. was transferred into the primary care of David. It further described Laura as being "dilatory and uncooperative throughout these proceedings," especially in refusing to pay the guardian *ad litem*'s fees, refusing to allow the guardian *ad litem* to see her residence before ultimately relenting, and delaying taking the PEth test. David, for his part, had repeatedly engaged in conduct demonstrating that he was not interested in working with Laura on issues involving their son. In particular, the court deemed David's unilateral decision to remove J.H. from his school and day-care center without notice to Laura "a clear indication that he has no intention of communicating with Laura for J***'s best interests." To give David sole decision-making responsibility for J.H., the court believed, would be to "essentially excise[ ]" Laura from her son's life, which would not be in his best interest.

¶ 34    Ultimately, the court allocated to David sole responsibility for all non-emergency health decisions, and it limited Laura to supervised parenting time through one of two designated providers or through a person or agency the parties agreed to in writing. During their respective parenting times, each parent would have sole responsibility for making routine decisions or

emergency decisions affecting health or safety. The court also ordered that, unless both parents agreed otherwise, J.H. was to attend David's neighborhood public school. Beyond that, however, it allocated both parents joint responsibility for decisions about J.H.'s education and extracurricular activities.

¶ 35    In terms of finances, the court ordered that each party would be responsible for paying half of the costs for J.H.'s schooling, extracurricular activities, and health insurance. They would also each be responsible for half the cost of the parenting coordinator's fees and any mediation they attended as a prerequisite to seeking a substantial modification of the dissolution judgment. Although Laura testified that she only earned $57,000 annually due to taking time off, the court found that she had not given a valid explanation for why she was not able to work full time. Based on her rate of pay as a bus driver, which was $39 per hour, the court found that Laura would be able to make approximately $81,000 if she worked a full-time schedule.[1] It therefore imputed to her an annual gross income of $70,000. Based on the Form 1099 David submitted with his 2023 tax return, the court found that he had a gross income as a non-union truck driver of $39,000. Using those figures, the court calculated that, per the applicable guidelines, Laura would pay $713.35 per month in child support. However, because it wanted to ensure that Laura had the money necessary to pay for supervised parenting time, the court determined a downward deviation of $250 was warranted, and it set child support at $463.35 per month.

¶ 36                                      II. ANALYSIS

¶ 37    Laura, who is representing herself, is appealing the trial court's judgment. She asks us to reverse or vacate the trial court's judgment and to remand for a new trial. She also asks us to award her "primary guardianship," order David to pay child support, bar the guardian *ad litem* from testifying, bar evidence about the PEth test results, overturn the court's order requiring J.H. and Z.R. to be kept apart, hold David in contempt for interfering with her parenting time, and order David to pay Laura's remaining share of the guardian *ad litem*'s fees.

---

[1]    This figure represents 40 hours worked per week for all 52 weeks of the year.

¶ 38                          A.  Preliminary Matters

¶ 39     Before going any further, there are three things about this appeal that affect how we consider and decide it.

¶ 40                        1.  The Record is Incomplete

¶ 41     Laura is the appellant in this case, which means she has a duty to provide us with a complete record of what happened in the trial court. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391 (1984). Under the rules, the record should include the common law record, which contains the parties' filings, the orders entered by the court, and the judgment. Ill. S. Ct. R. 321 (eff. Feb. 1, 1994). The record should also include a report of proceedings that shows what happened during trial and during pre- and post-trial hearings. Ill. S. Ct. R. 321 (eff. Feb. 1, 1994); Ill. S. Ct. R. 323(a) (eff. July 1, 2017). The report of proceedings is usually made up of transcripts taken by a court reporter, but when no transcript is available, the rules allow court-certified bystander's reports or agreed statements of facts to be used instead. Ill. S. Ct. R. 323(c), (d) (eff. July 1, 2017).

¶ 42     In this case, the common law record appeals to be complete, but the report of proceedings is not. It contains only one transcript, which shows what happened at the August 19, 2022 hearing on Laura's petition for an order of protection. There are no transcripts, bystander's reports, or agreed statements of fact for any other court proceedings, including the April 2024 trial. We realize that Laura tried to give us a complete record by asking the trial court to certify a bystander's report of the trial and other proceedings. The trial court, however, rejected Laura's proposed bystander's report after she admitted that it did not completely and accurately reflect the testimony of the witnesses at trial.[2] The appendix to Laura's brief on appeal contains what appears to be her proposed bystander's report, but the rules do not allow us to consider uncertified bystander's reports. See *People v. James*, 337 Ill. App. 3d 532, 533-34 (2003).

---

[2]  This order, which was entered on October 8, 2024, is not part of the record on appeal, but it can be accessed through the circuit court's electronic docketing system. As that is a "source[ ] of indisputable accuracy," we may take judicial notice of that order. *Zahdan v. Frontline Business Enterprise Inc.*, 2024 IL App (1st) 221351, ¶ 21 (taking judicial notice of order entered while appeal was pending).

¶ 43    The incomplete report of proceedings does not require us to dismiss the appeal, especially since the trial court's opinion sets out much of the evidence and testimony that was presented at trial. See *People v. Gabriel*, 2020 IL App (1st) 182710, ¶ 37. But when the record does not show what happened in court, we have to presume that the trial court followed the law and that the facts supported any decisions the court made. *Foutch*, 99 Ill. 2d at 391-92. Also, any doubts about what occurred because the record is not complete have to be resolved against Laura. *Id.* at 392.

¶ 44                    2.  Problems With Laura's Brief

¶ 45    Illinois Supreme Court Rule 341(h) (eff. Oct. 1, 2020) sets out what must be included in an appellant's brief. Laura has submitted a brief that she prepared by using the form specifically authorized by the Illinois Supreme Court for appellants' briefs. Because Laura used the approved form, her *pro se* brief contains each of the nine sections required by Rule 341(h). The argument section of her brief, however, does not always contain what it should.

¶ 46    Under the rules, the argument section of the brief must "contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). In other words, the brief should identify the rulings that are being challenged, explain why those rulings were wrong or improper, cite legal authority (such as a case or a statute) showing that what the court did was wrong, and cite the pages of the record showing any facts that are relevant to the alleged error. The point of requiring these things is to make sure that, when we consider an appeal, the issues are "clearly defined with pertinent authority cited and a cohesive legal argument presented." *First Mercury Insurance Co. v. Nationwide Security Services, Inc.*, 2016 IL App (1st) 143924, ¶ 21.

¶ 47    Laura's brief does a good job of identifying *what* she believes the trial court got wrong. However, it often does not explain *why* what the court did was wrong, and most of the legal authority Laura cites is not relevant to her arguments. We recognize, of course, that Laura is a non-lawyer who is representing herself. Following the guidance of our supreme court's Commission on Access to Justice, we therefore "[f]ocus on the content of [her brief] and the issues raised, not

on details that may serve mostly as barriers." Illinois Judicial Branch, *Bench Card: Self-Represented People in the Courtroom* (Jan. 2023). But *pro se* parties still have to follow the rules. *Ellis v. Flannery*, 2021 IL App (1st) 201096, ¶ 8. And the requirements of Rule 341(h)(7) are about substance, not technical form. We cannot understand arguments that are not explained, and we cannot evaluate whether the trial court made a mistake without knowing the governing law and the relevant facts of the case, which is why Rule 341(h)(7) requires parties to cite legal authorities and the record.

¶ 48     The consequence of violating Rule 341(h)(7) is forfeiture of the argument. See *Hall v. Naper Gold Hospitality LLC*, 2012 IL App (2d) 111151, ¶ 12. So, when Laura's failure to explain an argument or support it with appropriate citations prevents us from being able to understand and evaluate it, we will deem that argument to have been forfeited.

¶ 49                    3.  Problems with David's Brief

¶ 50     Like Laura, David is representing himself on appeal, and he has filed an appellee's brief prepared using the authorized form. Although appellees can choose to leave out certain sections, their briefs must comply with the requirements of Rule 341(h). Ill. S. Ct. R. 341(i) (eff. Oct. 1, 2020); *Plooy v. Paryani*, 275 Ill. App. 3d 1074, 1088 (1995). David's does not. In particular, David's brief does not cite the record, and the contentions in the argument section are supported by only a single unexplained citation to "750 ILCS 5/606," which we understand to be a reference to the provisions governing allocation hearings, which are now found in section 606.5 of the Marriage Act (750 ILCS 5/606.5 (West 2022)). See Pub. Act 99-90 (eff. Jan. 1, 2016) (repealing section 606 and enacting section 606.5). We find that, by not citing relevant law or the record, David has forfeited every contention in the Rule 341(h)(7) argument section of his brief, leaving him in the same position that he would have been had he not filed a brief. *Cf. Plooy*, 275 Ill. App. 3d at 1088 (1995) ("When an appellee does not address arguments in her brief, her position should be equivalent to that as if she had not filed a brief at all."). That does not mean, though, that Laura automatically wins. *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128,

133 (1976). When the record is simple and the issues can be easily decided without the help of an appellee's brief, we may choose to decide the appeal on the merits. *Id.* As those things are true about this case, we choose to decide it on the merits despite David's deficient brief.

¶ 51                                    B.  David's Jurisdictional Challenge

¶ 52        Briefly, in his Rule 341(h)(4) statement of jurisdiction, David argues that we do not have jurisdiction because Laura's notice of appeal was untimely. But he concedes, and the record confirms, that Laura filed her notice of appeal 29 days after the trial court entered its judgment. Under the rules, parties have 30 days after the entry of judgment to file a notice of appeal, which means that Laura's appeal was timely. Ill. S. Ct. R. 303(a)(1) (eff. July 1, 2017). David's argument that Laura was required to file the notice of appeal within seven days of the judgment misunderstands Rule 311(a)(2), which sets a seven-day deadline for *serving* a notice of appeal on the trial judge and the chief judge of the circuit once it is filed. Ill. S. Ct. R. 311(a)(2) (eff. July 1, 2018); see also Ill. S. Ct. R. 303(c) (eff. July 1, 2017) (requiring notice of appeal to be served on other parties within seven days of filing). Because Laura *filed* the notice of appeal within 30 days of the judgment, as required by the rules, we have jurisdiction. Ill. S. Ct. R. 301 (eff. Feb. 1, 1994); *Secura Insurance Co. v. Illinois Farmers Insurance Co.*, 232 Ill. 2d 209, 213 (2009).

¶ 53                                       C.  Issues Raised By Laura

¶ 54        Laura's *pro se* brief on appeal is broken down into three numbered arguments that appear to correspond to three critical points in the dissolution proceedings: (1) the August 2022 order to keep J.H. and Z.R. separated, (2) the January 2024 order that effectively transferred temporary custody of J.H. to David, and (3) the court's final opinion and judgment entered after the April 2024 trial. To make it easier for the parties to follow our analysis, we will use the same structure and, to the extent possible, address the specific arguments under each numbered heading in the same order that Laura's brief makes them.

¶ 55                    1. The August 2022 Order to Keep J.H. and Z.R. Separated

¶ 56        In her first argument, Laura contends that the trial court erred by ordering that J.H. be kept separated from his older half-brother Z.R. in August 2022, an order that the court never expressly rescinded. She argues that "there is no evidence of supporting fact[s] of false allegations made against [Z.R.]," that the DCFS investigation into the incident determined that the report of suspected child abuse or neglect was unfounded, and that the recommendations in a home-study report prepared by Family Supportive Services that J.H. sleep independently and not be left alone with Z.R. without a parent being present were "never considered." We note that Laura does not support her argument with citations to relevant legal authority, which means she has forfeited it.[3] It is clear, however, that Laura is challenging the propriety of the trial court's decision to order J.H. and Z.R. to be separated in light of the facts before the court, so we excuse her forfeiture.

¶ 57        Initially, it is not entirely clear whether the court's separation order is reviewable. The record discloses that the court first ordered J.H. and Z.R. to be separated on August 12, 2022, as a modification to the emergency order of protection. That same day, the court also appointed a guardian *ad litem* for J.H. Then, after the emergency order expired and the court denied Laura's request for a plenary order of protection, on August 23, the court ordered that "[Z.R.] shall be kept away from [J.H.] until further order of the Court." It does not appear that the court ever changed or withdrew that separation order. Its January 26, 2024, order on David's emergency motion noted that Laura had "failed to keep [Z.R.] *** away from [J.H.] as ordered." In its opinion and judgment order, the court found that Laura's inability to keep the two boys apart justified restricting her to supervised parenting time. However, it did not explicitly reaffirm its interim order requiring J.H. and Z.R. to be separated. It is possible that the court believed that, with Laura restricted to supervised parenting time, there was no need to order J.H. to remain separated from Z.R.

_____

[3]   Laura cites *People v. Jones*, 2023 IL App (4th) 230837, ¶¶ 27, 30, and *Kumar v. Bornstein*, 354 Ill. App. 3d 159 (2004) (appellate case number 2-04-0134). The passage she cites in *Jones* discusses the standard of review in appeals from pretrial detention orders in criminal cases. See *Jones*, 2023 IL App (4th) 230837, ¶¶ 27-30. *Kumar* involves the tort of abuse of process. See *Kumar*, 354 Ill. App. 3d at 164-170. Neither case has any apparent relevance to the trial court's separation order.

¶ 58      But even assuming that the final judgment incorporated the separation order, we find no error. An order requiring J.H. and Z.R. to be separated would be, in effect, another restriction on Laura's parenting time. See 750 ILCS 5/600(i) (" 'Restriction of parenting time' means any limitation or condition placed on parenting time, including supervision.") (West 2022). The trial court's determination that a particular restriction is necessary is reviewed for an abuse of discretion. *In re Marriage of Hipes*, 2023 IL App (1st) 230953, ¶ 54. That means we cannot reverse the trial court's order unless its ruling was "arbitrary, fanciful, or unreasonable" or based on a view that "no reasonable person would take." *Id.*

¶ 59      Here, we do not find an abuse of discretion. The trial court's opinion states that Z.R. had a history of engaging in sexually inappropriate behavior, including with J.H. Additionally, it states that J.H. reported to both David and the guardian *ad litem* that he had been hit and punched by Z.R. during the 2023 winter break. We recognize that Laura challenges these factual findings. However, because we lack a report of proceedings for the trial, we must presume that the trial court's findings were supported by the evidence presented. *Foutch*, 99 Ill. 2d at 392. And based on these facts, it was reasonable for the trial court to conclude that Z.R.'s past sexual and violent conduct directed at his younger brother made their separation necessary to protect J.H.

¶ 60                          2.  The January 2024 Emergency Custody Change

¶ 61      Laura's second argument is that the trial court erred when entering its January 26, 2024, order granting David's emergency motion to transfer of J.H. into his care, to give him sole decision-making authority, and to restrict Laura to supervised parenting time. We do not need to consider whether the court's January 26 order was proper because it no longer has any legal effect. The point of the order was to provide for J.H.'s health and safety until the court entered its final judgment. In legal terms, the entry of the final judgment made that interim order moot because it no longer matters: even if we were to reverse it, it would have no effect on the final judgment. *Cf. Wilson v. Jackson*, 312 Ill. App. 3d 1156, 1163 (2000) (finding that allegations of error associated with interim order of protection became moot when the court entered a plenary order of protection).

For that reason, we decline to decide whether the trial court's decision to grant the emergency motion was proper.

¶ 62     With that said, the contentions Laura raises under this argument heading would also be applicable to her challenge to the court's final opinion and judgment. We therefore address her particular arguments in that context.

¶ 63                                        a.  Alcohol Testing

¶ 64     Laura contends that the trial court erred by ordering her to undergo a test for PEth:

> "Pursuant to ILSCR 215, out of time, 219, there was no good cause for PEth test, there is no reason listed as to necessity of test. [Citation to David's motion for testing.] Results had no effect on relationship between Petitioner and minor 'J***.' Petitioner had custody of minor from birth. Respondent never had complaint of petitioner[']s use of alcohol during marriage, after filing of petition for dissolution of marriage."

The thrust of this argument, as we understand it, is that there was no justification for the court to order the PEth test under Illinois Supreme Court Rule 215 (eff. Jan. 1, 2018).

¶ 65     Rule 215(a) provides: "In any action in which the physical or mental condition of a party *** is in controversy, the court, upon notice and on motion made within a reasonable time before the trial, may order such party to submit to a physical or mental examination." The court's decision to order a Rule 215 examination is reviewed for an abuse of discretion. *Doe v. Weinzweig*, 2015 IL App (1st) 133424-B, ¶ 20.

¶ 66     Here, the absence of a report of proceedings from the December 7, 2023 hearing prevents us from considering whether the trial court erred by ordering the parties to submit to PEth testing. Without knowing what information was disclosed at that hearing, we cannot evaluate whether the court could have reasonably determined that Laura's alcohol use was an issue in controversy. Similarly, without the benefit of the judge's oral remarks, we do not know what reasons the court

gave for ordering testing. See Ill. S. Ct. R. 323(a) (eff. July 1, 2017) ("A report of proceedings may include *** a brief statement of the trial judge of the reasons for [the] decision."). Because we lack a report of these proceedings, we presume that the trial court's decision to grant the motion had a proper factual and legal basis. *Foutch*, 99 Ill. 2d at 392.

¶ 67                                    b.  Completion of a Parenting Course

¶ 68        Laura contends: "Pursuant to No[.] 2-04-0134, Kumar v Bornstein,[4] abuse of process, Appellee never completed parenting course entered December 9th, 2022 [citation to order], relocation can't be entered without the parties['] certificates of completion pursuant to 750 ILCS 5 IL dissolution of marriage Act (IMDMA)."

¶ 69        We are not aware of any provisions in the Marriage Act that require parenting courses. Supreme Court Rule 924, however, generally requires parents in dissolution proceedings that involve the allocation of parental responsibilities to "attend and complete an approved parenting education program as soon as possible." Ill. S. Ct. R. 924(b) (eff. Mar. 8, 2016). But the rule does not require the parents to file certificates of completion. Nor, for that matter, did the court's order in this case. In any event, even if David did not complete the mandatory parenting program, that would not prevent him from assuming care and possession of J.H. The consequence for noncompliance is that "[t]he court may impose sanctions on any party willfully failing to complete the program." Ill. S. Ct. R. 924(c) (eff. Mar. 8, 2016). When a party violates a court rule or order, the court has discretion to determine what sanctions, if any, are appropriate. See *In re Marriage of Vickers*, 2022 IL App (5th) 200164, ¶ 55. Nothing in the rule requires the court to deny decision-making authority or parenting time from a party who does not complete a parenting course. So, even assuming that David did not complete the mandatory parenting program, that would not mean that the court's allocation of decision-making or its determination of parenting time was wrong.

¶ 70                                    c.  The Guardian *ad Litem*

¶ 71        Laura next raises four complaints about the conduct of the guardian *ad litem* in this case.

---

4    See *supra* note 3.

¶ 72    First, Laura contends: "Guardian *ad litem* did not file or provide Petitioner with a written report of findings." Under the Marriage Act, unless the court orders otherwise, the guardian *ad litem* is required to "submit to the court and the parties a written report, written recommendations, or a proposed parenting plan, in accordance with the child's best interests, not less than 30 days before a final hearing or trial." 750 ILCS 5/506(a)(2) (West 2022). However, the record does not show that Laura objected to the absence of a report at trial, meaning that this claim of error has been forfeited. See *In re Marriage of Saheb*, 377 Ill. App. 3d 615, 626-27 (2007) (finding that father forfeited claim that court erred by allowing guardian *ad litem* to deliver an oral report before trial rather than a written report by failing to object in the trial court). Furthermore, without a complete report of proceedings, we also unable to determine whether the parties and the court discussed the guardian *ad litem*'s report before trial or whether Laura was prejudiced at trial because no report was filed.

¶ 73    Second, Laura contends:

> "Ethical violation of Guardian *ad litem* whom [*sic*] initially filed emergency motion January 19, 2024 [citation to guardian *ad litem*'s motion] without proper investigation, was heard January 25, 2024 [citation to David's motion], Judge Pamela Loza told GAL this filing was inappropriate for her to file and then advised Respondent[']s attorney to file motion by end of day, to be heard January 26th, 2024. [Citation to order granting David's motion.]"

The record does not support Laura's assertion that the trial court deemed the guardian *ad litem*'s January 19 emergency motion improper. Still, we agree that the guardian *ad litem* went beyond her proper role by filing the January 19 emergency motion. A guardian *ad litem* is not the child's courtroom advocate. See *Nichols v. Fahrenkamp*, 2019 IL 123990, ¶¶ 17-18 (contrasting guardians *ad litem* with attorneys and child representatives); see also 750 ILCS 5/506(a) (2022) (describing those three roles). Instead, "the guardian *ad litem* is the 'eyes and ears of the court.' " *Nichols*, 2019 IL 123990, ¶ 46 (quoting *In re Mark W.*, 228 Ill. 2d 365, 374 (2008)). The job of a guardian

*ad litem* is to help the court decide what would be in the child's best interest by investigating the case, interviewing the child and the parties, and making recommendations to the court. See 750 ILCS 5/506(a)(2) (West 2022). The only pleadings they can file are those "relating to procedural matters," and even doing that requires the court's permission. 750 ILCS 5/506(a)(2)(iii) (West 2022). Having said that, we do not see how the guardian *ad litem*'s misstep shows that the trial court erred. Indeed, in Laura's telling, the court acted appropriately by declining to act on the guardian *ad litem*'s motion. The court did not act until David, who was obviously entitled to advocate for what he believed would be in his son's best interests, asked the court to transfer J.H. into his care.

¶ 74    Third, Laura contends: "Petitioner reached out to GAL numerous times about minor while in care of Respondent with no responses." This argument is not supported by any citations to the record, so it has been forfeited under Rule 341(h)(7).

¶ 75    Fourth, Laura contends: "Judge Pamela Loza asked Appellee's attorney 'Luckett' what Guardian *ad litem*, she would like to use for case August 2022 and Attorney Luckett responded Arlette Porter." This argument is not supported by any citations to the record, so it has been forfeited under Rule 341(h)(7).

¶ 76                          3. The Final Judgment Order

¶ 77    Laura's third and final argument is that the trial court made a series of errors in its final judgment order. We will address each of her specific contentions in turn.

¶ 78                          a. Child Support

¶ 79    Laura contends:

> "Miscalculated child support based on Petitioner's possibility to make
> income [citation to opinion][,] not including Petitioner['s] filed financial
> affidavit, also not including Petitioner['s] Family Medical Leave Act
> (FMLA) for doctors appointments and other necessary family
> emergencies. Error of law, violation of child support 750 ILCS 5/505.

> Respondent has no filed financial affidavit also making an error of law
> and facts to determine payments of child support of petitioner pursuant
> to Jones, 2023 IL App 4th 230837, 27, 30.”

We find that Laura has not shown error for any of these reasons.

¶ 80  First, the trial court properly relied on Laura's potential income rather than her actual income based on its finding that Laura's actual income of $57,000 reflected "substantial time off work" that she took for which she did not give a "valid explanation." See 750 ILCS 5/505(a)(3.2) (West 2022) ("If a parent is voluntarily unemployed or underemployed, child support shall be calculated based on a determination of potential income.")

¶ 81  Second, David was not required to submit a financial affidavit. Although Laura cites section 505 of the Marriage Act, that statute only requires parties to submit financial affidavits for summary hearings held to determine interim child support. *Id.* § 505(a)(3)(E)(II); see *id.* § 501(a)(1). That requirement does not apply to child-support determinations made after an evidentiary hearing like the one held here. *Id.* § 505(a)(3)(E)(III).

¶ 82  Third, the record shows that the trial court, did, in fact, consider Laura's need to take leave from work. In its opinion, the court noted that Laura testified that "she had to take Z to therapy." Beyond that, the record does not show that Laura's ability to earn income was inhibited by any medical appointments or family emergencies. Without a report of proceedings for the trial, we must presume either that Laura did not put forward any other evidence about her need to take significant leave or that, if she did present such evidence, the trial court considered it. See *Foutch*, 99 Ill. 2d at 392.

¶ 83  Fourth, *Jones* addresses the standard of review in appeals from pretrial detention orders in criminal cases. See *Jones*, 2023 IL App (4th) 230837, ¶¶ 27-30; see also *supra* note 3. It has no relevance to how to calculate child support. Because *Jones* is not relevant to the issues on appeal, any arguments Laura makes that rely on *Jones* are forfeited under Rule 341(h)(7).

¶ 84                                  b.  Ages of Laura's Children

¶ 85        Laura contends: "Appellant has three minor children [citation to opinion] not three adult [citation to birth certificates]." Her argument suggests that the court found that three of Laura's children were adults. The court's opinion, however, says that the party with three adult children was "Respondent"—*i.e.* David. It found that "Petitioner"—Laura—had four children, only one of whom was an adult. Because the record contradicts this argument, it fails.

¶ 86                                  c.  Alcohol Testing

¶ 87        Laura contends: "Order of Peth [*sic*] test results [citation to opinion] violated discovery rule ILSCR 219." As we have already explained, because the record does not include a report of proceedings from the December 7, 2022 hearing, we presume that the trial court acted properly when it ordered the parties to undergo PEth testing. We reject this claim of error.

¶ 88                                  d.  Abuse of Process

¶ 89        Laura contends:

> "Abuse of Process No. 2-04-0134[5] occurred [a]fter numerous continuances of court dates with no extensions filed on behalf of Respondent, creating a[n] unnecessary extension of discovery, causing Petitioner to lose custody of minor 'J***' after a created false narrative."

Abuse of process is the name of a tort claim for "misus[ing] the legal process to accomplish some purpose outside the scope of the legal process itself." *Selby v. O'Dea*, 2020 IL App (1st) 181951, ¶ 60. No such claim is at issue here, so Laura's cited legal authority is not relevant. Furthermore, the trial-court proceedings lasted more than three years, and Laura neither specifies which continuances she believes should not have been granted nor explains why the court abused its discretion by continuing the matter to a later date. See *Doe v. Parillo*, 2021 IL 126577, ¶ 65 (reviewing denial of continuance for abuse of discretion). Because Laura does not cite relevant

---

5    See *supra* note 3.

legal authority, identify any specific errors, or explain why the court's actions were erroneous, she has forfeited this argument under Rule 341(h)(7).

¶ 90                                  e.  Rejection of Laura's Witnesses

¶ 91        Laura contends:

> "Appellant's mother testified minor 'J***' got a rash while visiting her winter 2023 [citation] Appellant[']s cousin testified Z*** was with her during winter break 2003 [citation] proving no violation to keep minors sep[a]rated per court order."

Laura does not cite any law, so we could find that she has forfeited this argument under Rule 341(h)(7). However, she is obviously challenging the trial court's factual finding that she permitted J.H. and Z.R. to be together over the 2023 winter break. Because we are able to understand her argument, we excuse her forfeiture.

¶ 92        On appeal, we must accept a trial court's factual findings unless they are against the manifest weight of the evidence, which is only the case when "the opposite conclusion is apparent" or "the findings appear to be unreasonable, arbitrary, or not based on the evidence." *Young v. Herman*, 2018 IL App (4th) 170001, ¶ 56. Although we lack a report of proceedings, the trial court's opinion discloses that Laura's mother, Sherry Blondin, testified that, "[d]uring the Winter Break of 2023, she cared for J*** and during this past Winter Break of 2023 the boys were never together." It also recited that Laura's cousin Melita Gordon "testified that during Winter Break of 2023 when she watched Z, J*** was never present." However, later in its opinion, the court noted that it had also heard evidence that J.H. and Z.R. were together at Blondin's home: "Over Winter Break 2023, J*** told the [guardian *ad litem*] that Z was with him at his grandmother's home in Rockford and he pushed an[d] hit him, causing J*** to be bruised." Thus, the record discloses that, although Laura's witnesses testified that J.H. and Z.R. were not together at their grandmother's home, there was other evidence contradicting her relatives' testimony.

¶ 93    In proceedings to allocate parental responsibilities under the Marriage Act, the trial court is responsible for deciding questions of fact. 750 ILCS 5/606.5(b) (West 2022). That responsibility means that it is the trial court's job, not ours, to decide who to believe when there is conflicting evidence or testimony. See *Chicago Architectural Metals, Inc. v. Bush Construction Co.*, 2022 IL App (1st) 200587, ¶ 49. The record discloses that there was evidence supporting the trial court's conclusion that J.H. and Z.R. were together. Furthermore, when there is not a report of proceedings, we must presume that the trial court's finding had a reasonable basis in fact and, accordingly, was not against the manifest weight of the evidence. *Cf. Corral v. Mervis Industries, Inc.*, 217 Ill. 2d 144, 156 (2005) ("An issue relating to a circuit court's factual findings *** obviously cannot be reviewed absent a report or record of the proceeding."). As such, we find no error.

¶ 94                    f.  Laura's Contract with Terry Smith

¶ 95    Laura contends: "Judge Pamela Loza['s] opinion states there is no contract on record with Petitioner and Private Investigator [citation] contract filed [citation] As well Terry Smith affidavit of events he witnessed [citation]." We agree with Laura that a copy of a purported "general service agreement" between her and Smith can be found in the record, apparently in support of a motion she filed in September 2023, several months before trial. But the trial court did not say that there was "no contract on record." What the court actually said was that "[n]o contract was ever *entered into evidence*." (Emphasis added.) Sure enough, there is no indication in the record that Laura offered the general service agreement into evidence at the April 2024 trial or that she, Smith, or anybody else testified about its terms. Because the record is incomplete, we must presume that the trial court correctly determined that the contract was not entered into evidence at trial. See *Foutch*, 99 Ill. 2d at 392.

¶ 96                    g.  David's Interference With Parenting Time

¶ 97    Laura contends: "Circuit court opinion mentions Petitioner has not exercised supervised visitation [citation] neglecting to admit[ ] visitation interference." She supports this argument with a citation to the court's April 23, 2024 order requiring David to return J.H. to his usual daycare and

school. Laura's claim is refuted by the opinion itself, which not only noted David's unilateral actions but pointedly found that allocating all parental responsibility to David would be against J.H.'s best interests because it was likely to result in Laura's total removal from J.H.'s life.

¶ 98    In a similar vein, Laura contends: "Opinion mentions several times Respondent excising Petitioner from minor 'J***'s' life [citation] to date November 2024 Petitioner has not spoken to minor at all, 720 ILCS 5/10-5.5." See 720 ILCS 5/10-5.5(b) (West 2022) (defining criminal offense of unlawful visitation or parenting time interference). Whatever might have happened after the trial court entered its judgment, though, is not before us in this appeal. "[T]his court reviews the decisions and orders of the trial court at the time they were entered." *In re Carmody*, 274 Ill. App. 3d 46, 58 (1995). If Laura believes that David is interfering with her parenting time, then she must raise that matter in the trial court, not on appeal in this court.

¶ 99                              h.  Abuse Allegations

¶ 100    Laura contends:

> "Throughout opinion false allegations made against minor 'Z***[.]'
> Petitioner addressed from beginning of case to have never heard any of
> complaints falsely made by Respondent [citations to transcript of
> August 19, 2022 order-of-protection hearing] [.]
>
>                              * * *
>
> Minor 'J***' has never made any outcrys [*sic*] [citation to opinion]
> hearsay of appellee[.] Respondent has never made false claims about
> Z*** until he 'Mr. Hayden' retained an attorney July 2022. June 2022
> Mr. Hayden had no complaints via text message related to minors being
> in company together [citation to screenshot of text message] [.]"

Although Laura fails to cite any legal authority to support this argument, it obviously challenges the credibility of the claim (accepted by the trial court) that Z.R. had physically and sexually abused J.H., so we will overlook that technical forfeiture. But once again, Laura cannot overcome

the incomplete record. As the truth of the abuse allegations is a factual question, we can reverse only if the trial court's decision to accept the abuse claims was against the manifest weight of the evidence. See *Young*, 2018 IL App (4th) 170001, ¶ 56. According to its opinion, the trial court heard testimony that Z.R. had engaged in physically abusive behaviors against J.H., had made inappropriate sexual gestures during a family trip, and had attempted to perform a sexual act on a child at his daycare. It also found that the record was "replete with Z's incidences of inappropriate sexual conduct." And, because there is no report of proceedings, we cannot evaluate these findings, so we presume that they were based on the evidence before the court and not against the manifest weight of that evidence. See *Corral*, 217 Ill. 2d at 156.

¶ 101                                            i. Night Shift

¶ 102        Laura contends: "Appellant has never testified to working nights." This is a clear challenge to the trial court's statement that the need to keep J.H. and Z.R. apart puts Laura "in a very untenable position" because "she works nights as a bus driver for the C.T.A. and needs someone to care for Z in the evening and keep the boys separated." Once again, without a report of proceedings, we have no way to evaluate whether the evidence supported the trial court's finding, so we presume that it did. See *id.*

¶ 103                          j. David's Failure to File Documentation

¶ 104        Laura contends: "Respondent was allowed to not file required documents by circuit court, *i.e.* parenting course completion, financial affidavit 750 ILCS 5, Staples vs. United States, 511 U.S. 600 (1994)." We have already explained that the record does not disclose whether David completed a parenting course and that, even if he did not, it would not justify reversing the court's judgment. See *Foutch*, 99 Ill. 2d at 392 (incomplete record); Ill. S. Ct. R. 924 (parenting-course requirement) (eff. Mar. 8, 2016). Similarly, we have already explained that David was not required to submit a financial affidavit because the court decided child support after an evidentiary hearing. 750 ILCS 5/505(a)(3)(E)(III) (West 2022).

¶ 105                          k.  David's Text Message to Terry Smith

¶ 106      Laura contends: "Appellee texted Mr. Terry Smith after opinion that his license was suspended [citation to screenshot of text message] instead of the medical excuse he provided verbally to circuit court [citation to opinion] Respondent again being allowed to speak with on evidence or supporting facts." Laura supports this argument by citing a screenshot depicting two text messages supposedly sent to Smith by David, but that screenshot was attached to Laura's notice of appeal, so it was not before the court when it entered judgment, which means that we may not consider it. *Carmody*, 274 Ill. App. 3d at 58.

¶ 107                          l.  The Guardian *ad Litem*

¶ 108      Laura contends: "Guardian *ad litem* did not file or provide Petitioner with a written report of her findings. Petitioner is requesting GAL Arlette Porter testimony to be barred and joint custody be issued to both parties." As we have already explained, Laura does not cite the record to show either that the guardian *ad litem* did not submit a report or that she objected to the guardian *ad litem*'s testimony at trial, so this argument is forfeited under Rule 341(h)(7). See *Saheb*, 377 Ill. App. 3d at 626-27.

¶ 109                          m.  Financial Affidavits

¶ 110      Laura contends: "Petitioner also request[s] immediate abate[ment] of child support as Respondent does not have a financial affidavit for 2021 & 2023." Again, David was not required to submit financial affidavits because child support was determined at an evidentiary hearing, so there is no error. See 750 ILCS 5/505(a)(3)(E)(III) (West 2022).

¶ 111                          n.  Miscellaneous Factual Mistakes

¶ 112      Laura next asserts that the court made a variety of errors of fact. We address each argument in turn.

¶ 113      Laura contends: "Misrepresented facts of opinion [citation to opinion] paragraph 9 (nine) Petitioner has never testified to not having a working vehicle [citation to registration card]." To support her argument that the trial court erroneously found that she did not have a car, Laura cites

to a copy of her 2023 state-issued vehicle registration card, which is found in the record as an attachment to her notice of appeal. As this was not before the court when it entered judgment, we do not consider it on appeal. *Carmody*, 274 Ill. App. 3d at 58.

¶ 114     Laura contends that, at one point in its opinion, the court "misnamed Petitioner as respondent." The record confirms that paragraph Y of the court's opinion and judgment says "Respondent shall have supervised Parenting Time" where it should say "Petitioner." As there is no dispute that this is a clerical error, we will order this matter remanded for the purpose of correcting the judgment *nunc pro tunc*. See *Wells v. State Farm Fire & Casualty Co.*, 2020 IL App (1st) 190631, ¶ 42 ("A court may modify its judgment *nunc pro tunc* at any time *** to correct a clerical error so that the record conforms to the judgment actually rendered.").

¶ 115     Laura contends that the trial court's opinion omitted that "Mr. Hayden *** abuses marijuana while holding a class A truck driving license while use [*sic*] of psychiatric meds." Laura does not cite anything in the record supporting this allegation, and she also does not explain why its omission or inclusion in the court's opinion matters. Thus, this argument is forfeited under Rule 341(h)(7).

¶ 116     Laura contends: "Misrepresented fact[:] Petitioner has never attended any meetings with Respondent for any false allegations against Minor 'Z***.' " This is an apparent reference to the trial court's reliance on David's testimony that he and Laura went together to Z.R.'s day camp to discuss an incident where Z.R. engaged in sexual conduct with another student. It is unclear whether Laura is arguing that the trial court misrepresented David's testimony or whether David's testimony was false, but either way, we find no error. Because there is no report of proceedings for the trial, we presume that the trial court accurately stated the testimony, and we presume that the trial court properly relied on that testimony. *Foutch*, 99 Ill. 2d at 392.

¶ 117     Laura contends that the trial court omitted that "Petitioner enrolled minor 'J***' into early intervention program at the age of three (3) years old." Laura does not cite anything in the record supporting this allegation, and she also does not explain why its omission or inclusion in the court's opinion matters. Thus, this argument is forfeited under Rule 341(h)(7).

¶ 118                              o. Laura's Bystander's Report

¶ 119        Finally, at the end of the argument section of her brief, Laura states: "Please see exhibit as fact of Petitioner." The appendix to her brief contains one document labeled "Exhibit," which is the four-page proposed bystander's report that Laura submitted to the trial court for certification. As noted earlier, we do not consider bystander's reports that have not been certified by the trial court, so we decline to consider the facts stated in Laura's proposed bystander's report. See *James*, 337 Ill. App. 3d at 533-34.

¶ 120                             III.  CONCLUSION

¶ 121        We have considered the arguments raised in Laura's *pro se* brief. For the reasons we have given, none of those arguments justify reversing the trial court's judgment. Therefore, we affirm the judgment. We remand for the trial court to correct paragraph Y of its judgment *nunc pro tunc* to reflect that Laura is limited to supervised parenting time, not David.

¶ 122        Affirmed and remanded with directions.